**Application of William J. SMYTHE and Morris H. Shamos.**

**Patent Appeal No. 8855.**

United States Court of Customs and Patent Appeals.

June 28, 1973.

Baldwin, J., dissented in part and filed opinion.

Eric P. Schellin, Schellin & Hoffman, Arlington, Va., attorney of record, for appellants.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Raymond E. Martin, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and LANE, Judges, and WATSON, Judge, United States Customs Court, sitting by designation.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals, adhered to on reconsideration, affirming the rejection of claims 34, 37–40, 42–44, and 47–50 of appellants' application serial No. 369,695, filed May 25, 1964, entitled "Automatic Analysis Apparatus and Method." We reverse.

*The Invention*

The invention relates to a continuous, automatic analysis system wherein discrete liquid samples, perhaps containing blood or other body fluids, are successively introduced into an apparatus as a continuous stream, the individual samples being separated by a segmentizing medium which, as originally claimed and as taught by the specification, is "air or other gas which is inert to the liquid" sample transmitted. The appealed claims are directed to both method and apparatus.

In the analysis apparatus a chemical reagent is automatically added to each discrete liquid sample to produce a color reaction indicative of the particular constituent in the sample to be tested, and the samples with the intervening portions of segmentizing medium are passed through the sight passageway of a flow cell as a continuous stream. The sight passageway forms part of a colorimetric analysis apparatus. Leading segments of the liquid samples, which are arranged in duplicate one following another, perform, along with the segmentizing medium, a cleansing function and each following segment has a volume at least equal to that of the sight passageway. When the sight passageway of the flow cell is fully occupied by the liquid sample to be analyzed, a recorder for the analysis, which receives its input from the colorimeter, is made operational.

Representative claims, for the purpose of dealing with the rejections, are as follows (emphasis ours):

34. A method of automatic quantitative analysis of a plurality of liquid samples each disposed in a respective container, wherein said samples are off-taken by an off-take device and are transmitted successively as a flowing stream to an analytical device including a flow cell having a sight passageway, said method including:

for each sample container in succession, coupling said off-take device to

such sample container, and in alternation therewith, to a source of an *inert fluid immiscible with said liquid samples,* thereby to off-take a segment of each of said liquid samples and intermediate segments of the inert fluid;

transmitting said segments of the liquid samples and inert fluid as a flowing stream to said analytical device; and

passing said flowing stream including segments of both the liquid samples and inert fluid through the sight passageway of the flow cell, the volume of at least one homogeneous portion of each liquid sample being at least equal to the volume of the sight passageway of the flow cell.

47. A method of automatic quantitative analysis of a plurality of liquid samples each disposed in a respective container, wherein said samples are off-taken by an off-take device and are transmitted successively as a flowing stream to an analytical device including a colorimeter having a flow cell with a sight passageway, said method including;

for each sample container in succession, coupling said off-take device to such sample container, and in alternation therewith, to a source of an *inert gas* immiscible with said liquid samples, thereby to off-take a segment of each of said liquid samples and intermediate segments of the inert gas;

transmitting said segments of the liquid samples and inert gas as a flowing stream to said analytical device;

passing said flowing stream including segments of both the liquid samples and inert gas through the sight passageway of the flow cell, the volume of at least one homogeneous portion of each liquid sample being at least equal to the volume of the sight passageway of the flow cell;

measuring the optical density of the liquid samples passing through the sight passage way of the flow cell; and

interrupting the operation of said recorder except when said portion of each sample having a volume at least equal to the volume of the sight passageway of the flow cell is in the sight passageway.

*Summary of Prior Art and Rejections*

The following three patents were relied on as prior art:

| | | |
|---|---|---|
| Skeggs | 2,797,149 | June 25, 1957 |
| Skeggs | 2,879,141 | Mar. 24, 1959 |
| Baruch | 3,193,358 | July 6, 1965 (filed July 2, 1962) |

Claims 34, 37–40, 42, 43, and 48–50 have been rejected for obviousness under 35 U.S.C. § 103 on Skeggs '141 in view of Skeggs '149 and further in view of Baruch. As will be discussed in greater detail shortly, the examiner and the board rely particularly upon the language of claims 9 and 10 of Skeggs '149 for a teaching of what appears to be a critical limitation of these claims.

Claims 34, 37–40, 43, and 44 were rejected under 35 U.S.C. § 112, paragraph one, for alleged failure to describe the invention insofar as the term "inert fluid" encompasses liquids, since the specification and original claims refer only to "air or other gas which is inert to the liquids transmitted" as the analysis samples.

Claims 47–50 were rejected under 35 U.S.C. § 112, paragraph one, it being alleged that the specification does not enable one skilled in the art to use an "inert gas" as a segmentizing medium in the invention.

## OPINION

The rejections and the positions of the parties will now be dealt with.

*The Section 103 Rejection*

This is the type of case where the invention resides in the discovery that an element or step which allegedly has always been included in prior art apparatus or method can be omitted, not merely with omission of its function but with improved results. Appellants admit, and

the prior art of record establishes, that the *general* apparatus for performing appellants' method invention is known. Appellants contend, however, that the prior art apparatus and method always provided for what is called "venting" of the segmentizing medium, or "debubbling," just prior to passing the successive liquid samples through the sight passageway in the flow cell.

Although there is some dispute about the teachings of the Skeggs '149 patent, the general nature of the invention and the prior art practice of venting or debubbling is illustrated by reference to a portion of Fig. 3 of that patent:

[A7551]

Skeggs '149 discloses automatic apparatus adaptable to blood analysis having sample-feeding apparatus similar to appellants'.[1] Liquid samples flowing through a tube in a continuous stream, the samples being separated in the tube by air as a segmentizing medium, are supplied to a colorimeter, which, with a recorder, translates color changes into a record of the amount of a given ingredient in each sample. On the way to the colorimeter a reagent is mixed with each sample to produce a color reaction which can be measured by the colorimeter. The reagent-treated samples with the segmentizing medium, air, interspersed therebetween, together flow as a segmented liquid stream "into a fluid line 70 leading to a transparent plastic flow cell 71 provided with an *open chamber*." (Emphasis ours.) "A communicating duct 73 leads from the lower end of *open chamber 72* to a horizontal cylindrical passage 74" (emphasis ours) wherein the photometric analysis is performed by recording the variations in light received by the phototube from the light source 32. Venting of the segmentizing air medium from the stream is claimed in claim 10 of Skeggs '149. The open chamber 72 in the above figure is the point at which this venting takes place. Presumably the dots shown in the open chamber are the draftsman's way of representing rising bubbles of the segmentizing medium, which is a gas entrained in a liquid.

Relating this to the invention here, appellants' discovery is that it is desirable to *omit* the prior art step of venting the air or other gas, i. e., "debubbling" the segmented stream of fluid samples. Appellants argue that they were the first to discover the advantages of omitting the debubbling step. They contend that the prior art cited by the Patent Office nowhere suggests that venting or debubbling can be dispensed with.

Appellants' brief explains the advantages of not debubbling as follows:

> 2. Prior to the invention of Appellants, it was generally the practice to vent or "debubble" the segmentizing medium just prior to passing the successive liquid sample[s] through a sight passageway included in the flow cell. * * * The practice of such venting or "debubbling" resulted in the leading and trailing portions of adjacent liquid samples becoming contiguous. As a result, intermixing occurred between such contiguous portions or successive liquid samples while passing from the "debubbling" apparatus. The passage of such intermixed portions resulted in contamination of the sight passageway of the flow cell. To alleviate the problem an uncontaminated portion of a successive adjacent liquid sample, therefore, had to be passed to "wash" the sight

1. Skeggs '149 issued to Technicon International, Ltd., a New York Corporation, and Skeggs '141 issued to Technicon Instruments Corporation, a New York corporation, which appears to be prosecuting the present application.

passageway before meaningful analysis could be effected on the remaining uncontaminated portion of such successive samples. As a result, the processing rate of the liquid samples was limited and, also, the initial volume of a liquid sample required for analysis was excessive. These limitations of the prior art apparatuses were due directly to the intermixing of successive liquid samples when moving between the "debubbler" portion of the apparatus and through the sight passageway of the flow cell.

3. The present invention overcomes these prior art limitations and provides for a substantially increased processing rate and, also, a significant reduction in the initial volume of samples required for analysis. These results are achieved by maintaining the integrity of the individual liquid samples in the continuous stream while passing through the sight passageway of the flow cell.

With this as background, we continue with a description of the other Skeggs reference, '141.

The question with respect to Skeggs '141 is whether or not it discloses venting. The Patent Office view is that no venting is shown. We disagree. The following portion of Fig. 8 shows the flow cell and related parts. It is described as a "diagrammatic representation":

We agree with the solicitor that the stream passing through line 218 is an air-segmented liquid stream. The question is whether the flow cell 220 is so constructed as to vent the air from the stream before the sample is analyzed.

Skeggs '141 contains, in addition to what the above drawing shows, the following statement (emphasis ours):

> The colored mixture flows into the flow cell 220, *which preferably is of the type illustrated and claimed in the copending application of Andres Ferrari, Jr.*, Serial No. 516,300, filed June 17, 1955, and assigned to the assignee hereof. The flow cell 220 is mounted in a holder 226 provided with a light passageway 228 having a constricted opening 230 adjacent one arm of the flow cell 220. Light passing from the light source 232 through the restricted light aperture 230 is transmitted through the colored mixture in the flow cell 220 to a photoelectric device or photo tube 234.

Does this disclose a vented flow cell, though no venting is mentioned in the above quotation? We think it does. Appellants have not conclusively wrapped up their proofs as they might have because, as correctly noted by the solicitor, they did not include the Ferrari patent in the record in this court, but their brief points out that the Ferrari application is now patent No. 2,983,184, issued May 9, 1961, and they quote from the disclosure of this patent, which is incorporated by reference into Skeggs '141, as follows (omissions and insertions ours for clarity):

> * * * as the dialyzate is discharged * * * into [the] flow cell * * *, the air present between adjacent segments of said dialyzate freely escapes into the atmosphere since [the] inlet opening * * * of said cell is open thereto. Thus it will be apparent that no air can be trapped into the liquid column * * * which is subjected to the light beam.

We do not consider that this disclosure, incorporated into Skeggs '141, is to be ignored merely because the Ferrari patent has not been included in the record in this court. There is no reason to doubt the accuracy of appellants' quota-

tion from Ferrari. We note particularly two factors indicating its reliability: it is consistent with Seggs '141 Fig. 8 and it has not been challenged by the solicitor who had ready access to the Ferrari patent. Furthermore, the same allegations of venting in the flow cell of Skeggs '141 were made before the board, as follows:

> The flow cell 220 is of the type more particularly described in the A. Ferrari, Jr. patent No. 2,983,184, filed on July 15, 1955 * * *. The flow cell 220 includes an open ended, or vented, mixing chamber wherein the continuous stream of liquid samples directed along conduits 216 and 218 is discharged, so as to purposefully vent the air bubbles. The liquid samples, now contiguous, intermix * * *.

We simply have to disagree with the board's conclusions that "Skeggs '141 does not mention the venting present in Skeggs '149" and that "The drawing in Skeggs '141 does not appear to require such venting." These statements are inconsistent with the whole disclosure of Skeggs '141, which includes the description of the structure of the Ferrari flow cell, "diagrammatically" shown in Fig. 8, incorporated by reference.

Obviousness of an unvented system as claimed by appellants therefore cannot be predicated on the disclosures of the specifications of Skeggs '149 or '141. The board admitted that venting is "present in Skeggs '149." The board and the solicitor are clearly wrong in suggesting that the flow cell of Skeggs '141 is unvented. One other basis for finding obviousness is argued, predicated on a difference which exists between claims 9 and 10 of Skeggs '149. Claim 10 reads (emphasis ours):

> 10. Apparatus for analyzing liquid samples containing a crystalloid constituent and a noncrystalloid constituent, *comprising* a dialyzer having a diaphragm and an inlet and an outlet at one side of the diaphragm for the passage of a stream of sample-containing liquid through the dialyzer at said side of the diaphragm, said dialyzer also having an inlet and an outlet at the other side of said diaphragm for the passage of streams of liquid into and out of the dialyzer at said other side of the diaphragm to form a stream of liquid containing the crystalloid substance which is diffused through the diaphragm from said first mentioned side thereof means for treating the liquid of said last mentioned stream for colorimetric analysis thereof, a colorimeter flow-cell to receive the treated liquid, tubes leading to and from the dialyzer for conducting the liquids to and from the dialyzer and to the flow-cell and means for introducing air into the tubes leading to the dialyzer for forming segmented streams of fluid composed of alternate segments of liquid and air passing through said tubes and the dialyzer and through the connections of the latter to said flow-cell, *and a vent for the escape of the air from said stream of treated liquid received in said flow-cell whereby an uninterrupted column of liquid is provided in the cell for colorimetric analysis of said liquid.*

Claim 9 of the patent is substantially identical down to the emphasized clause, which is omitted in claim 9. Based on this difference, and a similar omission of venting in other claims such as 20 and 22, the Patent Office argues that *a comparison of claims*

> * * * would clearly suggest to the plant engineer that the flow of segmented streams "to said flow cell" encompasses flow thereof through such cell.

We cannot agree. We do not believe that, either as an abstract principle or as applied to the facts of this case, the omission of the vent in one or more claims of Skeggs '149 coupled with the inclusion of the vent in another claim itself would suggest to one skilled in the art and that venting may be dispensed with. The specification of Skeggs '149 just does not support such a construction; the air-segmented stream "passes into a fluid line 70 leading to a trans-

parent plastic flow cell 71 *provided with an open chamber 72* * * *." (Emphasis ours.)

As to the major part of the argument of the solicitor, we do not find the difference between claims 9 and 10 to suggest or indicate to one of ordinary skill in the art that "the flow cell in question can at the option of the designer or 'plant engineer' be vented or not." The practice, time out of mind, has been that claims may be drafted as broadly as the prior art will allow, and that appears to be all that Skeggs has done in patent '149. The mere omission of claim limitations does not suggest omission of steps or parts. Furthermore, claim 9 still reads on apparatus containing venting means because of the word "comprising." In re Halley, 296 F.2d 774, 49 CCPA 793 (1961); Swain v. Crittendon, 332 F.2d 820, 51 CCPA 1459 (1964). Compare the discussion of reliance upon the *absence* of limitations in claims in another context in In re Cole, 326 F.2d 769, 51 CCPA 919 (1964).

Accordingly the rejection of claims 34, 37–40, 42, 43, and 48–50 under § 103 is reversed.

*The § 112 Rejections*

"Inert Fluid"

Claims 34, 37–40, 43, and 44 describe the segmentizing medium as an "inert fluid." The board affirmed the examiner's rejection of these claims saying, "As to the * * * term [fluid], the specification provides no antecedent basis or description of such fluids and therefore does not support the claims." The board noted that "additional structure is necessary to adapt the disclosed contribution to employ fluids other than air." The board further noted that the term "fluid" is "so broad as to include inoperative fluids."

The solicitor states that the "Board's rationale makes it clear that it regarded 35 U.S.C. § 112, paragraph 1 as the proper statutory basis of its rejection," and particularly argues that appellants fail to *describe* their invention in their specification.[2] The solicitor, explaining the basis of this rejection on the facts of this case, takes the position that "where the description of the invention is narrower than the scope of protection sought by the claims * * * the claims may be rejected under Section 112, paragraph 1, even though the term 'fluid' embraces both 'liquid' and 'gas' * * * and even though it 'would not encompass undue experimentation to arrive at a satisfactory method and structure to employ liquid and gases other than air' * * *." As the solicitor notes in his brief,

> The important point here is that appellants did not recite the use of 'fluid' broadly as a segmenting medium in describing their invention. * * *
>
> Insofar as the term 'fluid' in claims 34, 37–40, 43 and 44 encompasses liquids, there is no *description* thereof in appellants' specification.

We cannot agree with the broad proposition, apparent in the above quoted language, that in every case where the description of the invention in the specification is narrower than that in the claim there has been a failure to fulfill the description requirement in section 112. Each case must be decided on its own facts. The question which must be answered is whether the application originally filed in the Patent Office clearly conveyed in any way to those skilled in the art, to whom it is addressed, the information that appellants invented the analysis system with an inert fluid as the segmentizing medium. See In re Ruschig, 379 F.2d 990, 54 CCPA 1551 (1967). If it did, then appellants have made a written description of their invention within the meaning of the first paragraph of 35 U.S.C. § 112.

2. The board may have also treated the rejection of these claims under § 112 under the "enablement" section of the first paragraph, but the solicitor has narrowed the rejection by his argument to the "description" requirement.

Let us look at the description of the invention in the original application.

The segmentizing medium serves the functions, appellants' specification tells us, of "separating one [liquid] sample from another in the apparatus and for washing the conduits and the flow cell * * *." The essential function of separating discrete samples from each other is performed because the medium takes the shape of the supply lines and the flow cell through which it passes, while to some extent resisting any force which may tend to change its volume. This quality is precisely that of a "fluid" generically and of a "liquid" in particular. The "washing" function of the segmentizing medium appears to us, indeed, to be better performed using liquid rather than gas, and the Patent Office has given us no facts which would justify a conclusion that one skilled in the art would not find the disclosure to inherently teach that it is the very characteristics of *fluids* which are needed in a segmentizing medium here. We note also that the prior art Kessler patent No. 3,047,367, issued in 1962, made of record by appellants here and before the examiner, shows the use of a *liquid* segmentizing and cleansing medium instead of "air or other inert gas" in a system entitled "Automatic Analysis With Fluid Segmentation." In that patent it is stated that:

> In accordance with the present invention and pursuant to one of the objects thereof, the use of air or other inert gas as the cleansing agent is dispensed with and replaced by a liquid, in order to obviate certain difficulties which may be encountered when air or other compressible fluids are employed as the cleansing agents.

We believe that the use of an inert *fluid* broadly in this invention would naturally occur to one skilled in the art reading the description of the use of air or other gas *as a segmentizing medium* to separate the liquid samples. While fluid is a broader term, encompassing liquids, as noted by the solicitor, the specification clearly conveys to one skilled in the art that in this invention the characteristics of a fluid are what make the segmentizing medium work in this invention.

This is not a case where there is any unpredictability such that appellants' description of air or other inert gas would not convey to one skilled in the art knowledge that appellants invented an analysis system with a fluid segmentizing medium. In other cases, particularly but not necessarily, chemical cases, where there is unpredictability[3] in performance of certain species or subcombinations other than those specifically enumerated, one skilled in the art may be found not to have been placed in possession of a genus or combination claimed at a later date in the prosecution of a patent application. See, for example, In re DiLeone (DiLeone II), 436 F.2d 1033, 58 CCPA 934 (1971), and In re DiLeone (DiLeone I) 436 F.2d 1404, 58 CCPA 925 (1971), where Judge Baldwin, in dissent, stated at 436 F.2d at 1406–1407, 58 CCPA at 929:

> In the case before us, the Patent Office tribunals, and in particular, the examiner—who must be presumed by us to be skilled in the pertinent art in the absence of evidence to the contrary—have disputed the fact that the scope of appellants' invention would be obvious from the language of the description. Keeping in mind the well-known unpredictability of the chemical sciences, I find that the examiner's objections were reasonable. Beyond asserting that they are entitled to the broad claims they are seeking, appellants have not contradicted this position. Feeling, as I do, that the description requirement should serve to assure that one of ordinary skill in the pertinent art will in fact, be

3. As we pointed out in In re Cook, 439 F.2d 730, 734, 58 CCPA 1049, 1054 (1971), it is the predictability or the unpredictability of the elements, be they chemical or mechanical, which is determinative.

> taught by a specification disclosure, I conclude that the disclosure before us does not adequately describe the subject matter being claimed. [Footnote omitted.]

Here, however, where the broader concept of using "inert fluid" would naturally occur to one skilled in the art from reading appellants' description of the use and functions of the segmentizing media specifically described, we see no basis for denying appellants the claims which recite the segmentizing medium broadly as an "inert fluid." The alternative places upon patent applicants, the Patent Office, and the public the undue burden of listing, in the case of applicants, reading and examining, in the case of the Patent Office, and printing and storing, in the case of the public, descriptions of the very many structural or functional equivalents of disclosed elements or steps which are already stored in the minds of those skilled in the arts, ready for instant recall upon reading the descriptions of specific elements or steps.

We are not saying that the disclosure of "air or other gas which is inert to the liquid" sample *by itself* is a description of the use of all "inert fluid" media. Rather, it is the description of the *properties and functions* of the "air or other gas" segmentizing medium described in appellants' specification which would suggest to a person skilled in the art that appellants' invention includes the use of "inert fluid" broadly. The Kessler patent is only some additional evidence of the knowledge of one skilled in the automatic sample analysis art, and as such it supports appellants' position that to such persons appellants' description conveys the idea of using inert fluids broadly.

A hypothetical situation may make our point clear. If the original specification of a patent application on the scales of justice disclosed only a 1-pound "*lead* weight" as a counterbalance to determine the weight of a pound of flesh, we do not believe the applicant should be prevented, by the so-called "description requirement" of the first paragraph of § 112, or the prohibition against new matter of § 132, from later claiming the counterbalance as a "metal weight" or simply as a 1-pound "weight," although both "metal weight" and "weight" would indeed be progressively broader than "lead weight," including even such an undisclosed, but obviously art-recognized equivalent, "weight" as a pound of feathers. The broader claim language would be permitted because the *description of the use and function* of the lead weight as a scale counterbalance in the *whole disclosure* would immediately convey to any person skilled in the scale art the knowledge that the applicant invented a scale with a 1-pound counterbalance weight, regardless of its composition. Likewise, we find in the facts here a description of the use and function of the segmentizing medium which would convey to one skilled in the sample-analysis art the knowledge that applicants invented a sample analyzer with an inert *fluid* segmentizing medium.

Turning to the precedents, in In re Reynolds, 443 F.2d 384, 58 CCPA 1287, (1971), this court quoted with approval the following from the opinion in Technicon Instruments Corp. v. Cole Instruments, Inc.,[4] 255 F.Supp. 630 (N.D.Ill. 1966), aff'd, 385 F.2d 391 (7th Cir. 1967):

> By disclosing in a patent application a device that inherently performs a function, operates according to a theory, or has an advantage, a patent applicant necessarily discloses that function, theory or advantage even though he says nothing concerning it. The application may later be amended to recite the function, theory or advantage without introducing prohibited new matter.

4. The case involved, interestingly enough, the validity of the two Skeggs '149 and '141 patents, inter alia, which were cited as § 103 references here.

We agree with that statement, whether, as here, in the context of an ex parte rejection under the description requirement of the first paragraph of § 112, the right to make a count in an interference, Woofter v. Carlson, 367 F.2d 436, 54 CCPA 917 (1966), the right to rely upon a prior application under 35 U.S.C. § 120 which complies with the requirements of the first paragraph of § 112, In re Lukach, 442 F.2d 967, 58 CCPA 1233 (1971), or a new matter rejection of the claims as discussed in *Technicon.*[5] See In re Welstead, 463 F. 2d 1110, 59 CCPA 1105 (1972), a new matter case citing Fields v. Conover, 443 F.2d 1386, 1391–1392, 58 CCPA 1366, 1372–1374 (1971), as involving the written description requirement in another context.

The board also rested the alleged failure of the specification to describe the invention on possible inclusion of inoperative embodiments of the invention using "inert fluids" which it conceived. The board stated (emphasis ours):

> The term "inert fluid" emcompasses *colored* materials *adherent* to the walls of the sight tube, thus to render appellants' process inoperative, as well as liquid *wetting agents,* which appellants disclose * * * must be absent for proper operation. Thus, not only does the specification fail to support the method and apparatus claimed, where a fluid other than air is to be introduced, but the noted term is *so broad as to include inoperative fluids.* Appellants' specification, in its failure to provide antecedent basis for "inert fluid," renders it impossible for one skilled in this art to determine what classes of fluids are useful and which are not.

We can see no basis for either the board's premise that the use of the word fluid makes the claim so broad as to include inoperative fluids, or the board's conclusion that somehow any lack of antecedent basis for "inert fluid" makes it impossible to determine what classes of fluids are useful in the invention.

The use here of any particular "liquids" which would be inoperative, such as the examples given by the board—"colored materials," materials "adherent to the walls of the sight tube," and "liquid wetting agents"—would be predictably inoperative in the invention and thus would never be selected by one skilled in the art. As we have said before, it is almost always possible to so construe a claim as to have it read on inoperative embodiments. In re Cook, 439 F.2d 730, 734, 58 CCPA 1049, 1054 (1971), but the alternative of requiring an applicant to be so specific in his claims "as to exclude materials known to be inoperative and [which] even those *not* skilled in the art would not try" would result in claims which would fail to comply with 35 U.S.C. § 112, second paragraph, because they would be so detailed as to obscure, rather than to particularly point out and distinctly claim, the invention. In re Myers, 410 F.2d 420, 56 CCPA 1129 (1969), quoted with approval in In re Anderson, 471 F.2d 1237 (CCPA 1973). We therefore cannot agree with the board that the rejection under the first paragraph of § 112 is any more sustainable because the broader term "fluid" includes some "liquids" which might not work.

"Inert Gas"

Claims 47–50 have been rejected under 35 U.S.C. § 112, paragraph one, on the ground that insofar as the term "inert

5. The paragraph of the above *Technicon* quotation concludes with the sentence:

> In any event, the fact that the Patent Office allows such an amendment without objection thereto as new matter (within the meaning of Title 35 U.S.C., § 132) is entitled to an especially weighty presumption of correctness.

We note that here, too, the Patent Office made no new matter rejection of the language of the preliminary amendment reciting the segmentizing medium as an "inert fluid." See MPEP 608.04(b).

gas" used in these claims covers the use of gases other than air[6] as the segmentizing medium, the specification allegedly does not enable one skilled in the art to "make and use" the invention. The specification shows the segmentizing medium as air which is aspirated from the atmosphere surrounding the apparatus. The Patent Office position is that the use of an inert gas other than the air is not taught by the specification in a manner which would enable one skilled in the art to practice the invention.

Appellants maintain here, as they did before the Patent Office, that the Skeggs '149 patent suggests that any medium, liquid or gas, can be introduced along a pump tube by connecting the upstream side of the pump tube to the source of the medium. This Skeggs reference, as appellants point out, shows a series of openings for incoming fluid lines which lead either to a source of liquid or air, and appellants tell us that "it would not encompass undue experimentation to arrive at a satisfactory method and structure to employ liquid and gases other than air." We find ourselves in agreement with appellants. See In re Borkowski, 422 F.2d 904, 57 CCPA 946 (1970).

█ The rejections of claims 34, 37–40, 43, 44, and 47–50 under 35 U.S.C. § 112 are accordingly reversed.

The decision of the board is reversed as to all claims on appeal.

Reversed.

BALDWIN, Judge (dissenting in part).

I would affirm the rejection of claims 34, 37–40, 43 and 44 under the first paragraph of section 112 of the statute. The critical term in these claims, "fluid," is a generic term, which for our purposes may be considered to be made up of two major subgeneraliquids and gases. I agree that the appellants' specification adequately describes the genus of gases which meet the other claimed criteria, *i.e.*, gases which are "inert to the sample liquid," which is how I interpret the recitation "inert gas." However, I cannot agree that the specification contains an adequate description of the genus "fluid" under any reasonable standard. In the first place, only the subgenus "inert gases" is described, and it is apparent that one skilled in this art would not infer "inert fluids" from a description of "inert gases" alone. Secondly, it cannot be questioned that any other members of the "genus" (in this case there being only one, *viz.* "inert liquids") is anywhere disclosed or implied in the specification. Thus description of the genus cannot be inferred from the supplied descriptions of its member species. The final possibility is a description of the genus itself, either *in ipsis verbis*, which clearly is not present here, or implied, such as through a complete description of the properties which define the genus, which the majority contends exists in this case. I submit that the majority is in error.

The following exerpt is sufficiently representative of the contents of the specification concerning the segmentizing medium (emphasis supplied):

> The primary object of the present invention is to improve the precision of quantitative analysis of the samples of liquid. We have discovered that this important object can be accomplished by utilizing as much as possible liquid conduits, such as Teflon tubing, which have non-wetting surfaces instead of wettable surfaces, and

6. For the purposes of considering this ground of rejection it is not necessary to decide whether the claim language "inert gas immiscible with said liquid samples" means a chemically "inert" gas or only a gas which is inert with respect to the liquid sample. At least once in the original specification the segmentizing medium is described as "air or other gas which is inert to the liquid transmitted * * *. The solicitor states that "air is not inert." For present purposes, the enablement rejection relates specifically to the use of a gas other than atmospheric air, because it cannot be merely aspirated from the surrounding atmosphere; it does not matter whether it is chemically an inert gas.

by washing the flow cell between the passage of successive samples therethrough with one or more *bubbles of air or other gas which is inert to the liquid transmitted* through the conduits and through the flow cell, whereby contamination of one sample by another is prevented or is negligible. Further, the sample liquid which is transmitted through the flow cell during the analysis operation, at which time a record of the analysis is made, has a volume at least as large and preferably larger than the volume of the flow cell, so that there is no *air* in the flow cell when the liquid analysis operation is being performed. More specifically, while one or more *segments or bubbles of the air or other gas* are introduced into the liquid stream for separating one sample from another in the apparatus and for washing the conduits and the flow cell, it is unnecessary to remove said *bubbles* before transmission of the treated liquid samples through the flow cell, since the segmentation of the liquid stream by *air bubbles* is such that a sufficient volume of the treated sample liquid is devoid of *air bubbles* to enable its analysis as it flows through the flow cell. By reason of the provision of a volume of non-segmented treated liquid sample sufficiently large for analysis, namely, a volume of treated liquid sample at least as large as the volume of the flow cell, blending of segments of the same liquid sample and the need for removal of a comparatively large number of *air bubbles* are obviated.

Throughout the specification, only inert gas and, more often, air, which is used in the preferred embodiment, are mentioned as segmentizing mediums. There is no further discussion of the properties which those mediums have which make them useful. Thus the two properties relied on by the majority as delineating the properties of a "fluid," *i. e.*, (1) the ability of the medium to take "the shape of the supply lines and the flow cell through which it passes" and (2) its ability to resist "any force which may tend to change its volume," are never disclosed or discussed in the specification at all. True enough, the inert gases described by appellants inherently would possess the first property mentioned, and presumably even the most compressable of gases would qualify as having the second property "to some extent," as broadly phrased by the majority. But what the majority is saying is that the description requirement as to "inert fluids" is satisfied in this case, even though that genus is not specifically described by name, because it is impliedly described by the properties which define it, even though those properties are not specifically described by naming them, because those properties are impliedly described—by what?—by the fact that the members of the subgenus which *is* specifically described inherently possess those properties. What about those properties inherently possessed by gases which are strikingly different from those of liquids and would suggest that liquids would *not* be useful, such as density and viscosity?

More importantly, what kind of mental gymnastics are we going to force the skilled in the art to go through in order to determine what is described in a patent specification? The statute directs the specification to the skilled in the art, and that has two effects on the requirements for its content. Of course it establishes that the intended reader is not a babe in the woods, and that therefore the specification need not be burdened with those details which are already generally known in the art. But the intended reader is *no more* than one skilled in the art. He is not some master of law or logic who can be expected to inveterately expand each nuance contained in a specification into pyramids of disclosure. It is a general level of specialized knowledge which is required of him, not genius.

As to the majority's speculation that the washing function of the segmentizing medium would be "better performed using liquid rather than gas," it is not

only not supported by the record, but is also contrary to the implications of the only pertinent teachings in the record. Kessler, *whose invention it was to use a liquid segmentizing medium rather than a gas,* states as follows (emphasis supplied):

> In accordance with the present invention and pursuant to one of the objects thereof, the use of air or other inert gas as the cleansing agent is dispensed with and replaced by a liquid, in order to obviate certain difficulties which may be encountered when air or other compressible fluids are employed as the cleansing agents. In this connection, it will be understood that in most instances, *the use of air as the cleansing agent is to be preferred because it is highly effective for this purpose* and is readily available, without cost, from the ambient atmosphere. However, in certain processes, *e. g.,* in spectral-flame analyses, the compresibility of air or other inert gas may result in pulsations of the liquid introduced into the spectral flame and thus cause the flame to flicker or be unsteady. This objectionable result is eliminated pursuant to this invention, since liquid is incompressible.

In the final analysis, I believe that support for the majority's position reduces to the existence of the Kessler patent, which, I agree, is *some* evidence that the knowledge that liquid segmentizing mediums can be used was part of the general level of skill in this art. The question becomes whether this evidence is enough on the facts of this case to establish that the use of liquid segmentizing mediums was generally known in this art. If it is, then appellants are entitled to claims directed to the use of fluids (or for that matter to liquids, which as a practical matter is the same thing here) even though appellants never mentioned those embodiments in their specification as filed, at least insofar as the description requirement is concerned. Of course, it must *generally* known—the statute directs the specifica-

tion to those skilled in the art, not just to one or two practitioners who might happen to know it.

Before us we have appellants' specification, which is very strictly limited to "air or other gas inert to the sample liquid." The segmentizing medium is nowhere described as a "medium" or a "fluid." The specification is so strictly limited as to give rise to an implication that appellants considered such a limitation important. The record before us contains twenty-five patents, twenty-four of which have disclosures which are limited to air, or other inert gas in a manner similar to appellants' disclosure. To me that indicates that the only segmentizing medium which would "naturally occur" to one skilled in the art reading appellants' specification is air, or other gas inert to the liquid samples. The mere existence of the Kessler patent, which states that the preferred segmentizing medium is gaseous in all but a few special cases, is not enough to overcome what the other evidence indicates is the general knowledge of those skilled in the art.

I would therefore affirm the rejection of claims 34, 37–40, 43 and 44.