**Application of James D. MOTT.**

**Patent Appeal No. 76–568.**

United States Court of Customs and Patent Appeals.

Aug. 12, 1976.

John H. Dodge, II, Pravel & Wilson, Charles W. Hanor, Houston, Tex., attorneys of record, for appellant, James B. Gambrell, New York City, of counsel.

Joseph F. Nakamura, Washington, D.C., for Commissioner of Patents, John W. De-Whirst, Washington, D.C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

RICH, Judge.

This appeal is from the decision of the Patent and Trademark Office (PTO) Board of Appeals (board) affirming the rejection of claims 39, 42, 44, 46, 50, and 57 of appellant's application serial No. 256,194, filed May 23, 1972,[1] entitled "Pressure Operated Safety Valve with Lock Means." Other claims have been allowed. We affirm in part and reverse in part.

### The Invention

Appellant describes the general nature of his invention in his brief:

> This invention relates to a control fluid pressure responsive safety valve for use in hydrocarbon producing wells to preclude hydrocarbons escaping from the well and polluting the surrounding environment in the event of damage to the well head by shutting in the production tubing below the well head. * * * Despite the apparent complexity of the patent drawings, the essence of valve operation is the reciprocating movement of an operator sleeve that is normally biased upwardly to effect valve closure and which is shifted downwardly by application of increased control fluid pressure to open the valve.

We need reproduce only claims 42, 44, and 46, and the rejected (but unappealed) claims

---

1. Designated a continuation of application serial No. 72,034, filed September 14, 1970.

from which they depend, in light of the rejections below:

40. A well flow conductor value including:

a housing having means for connecting it in flow communication with a well flow conductor;

valve means disposed in the housing and movable therein between open and closed positions for controlling flow through the housing;

operating means in said housing movable longitudinally thereof for actuating said valve to move the same between open and closed positions;

locking means in the housing initially in an inoperative position spaced from said operating means and movable to a position engaging said valve operating means to positively lock said valve operating means in position holding said valve in open position.

42. A valve of the character set forth in claim 40, wherein:

said locking means is releasably held in position locking said valve operating means in position holding the valve open, and is releasable from engagement with said valve actuating means for movement to said initial inoperative position to permit the valve to resume operation.

43. A valve of the character set forth in claim 40 including:

fluid pressure responsive means on said operating means;

means for conducting control fluid pressure to said valve housing for acting on said fluid pressure responsive means to control movement of said operating means in response to such control fluid pressure; and

means at the surface for controlling control fluid pressure conducted through said control fluid conductor means to the valve in response to predetermined conditions.

44. A valve of the character set forth in claim 43 including:

second fluid pressure conductor means communicating with the valve housing to act on said operating means in a direction opposite the control fluid pressure from said first control fluid conductor means,

said two conductor means for control fluid providing means for counterbalancing the hydrostatic pressure of the control fluids in such conductor means from the surface to the valve housing to reduce the effect of such hydrostatic pressure on the valve operator means.

45. A method of operating a well including:

installing a flow conductor in said well for conducting fluids from a producing formation therein to the surface;

controlling flow through said flow conductor by a valve in said flow conductor controlled by control fluid from the surface in response to predetermined conditions of flow through the flow conductor and at the well surface;

moving said valve to open position independently of said control fluid from the surface;

locking said valve in such open position for performing well servicing operations through the open valve.

46. A method as set forth in claim 45 including:

providing a supplemental valve for control of fluid flow through the first valve while said first valve is held in the open position.

### Background

The application on appeal is related to another application by appellant, serial No. 368,840 ('840) (not of record here), but is apparently not a parent, continuation, or continuation-in-part of that application, and it does not have the same disclosure. The '840 application contains claims copied, both verbatim and in modified form, from a patent to Taylor, No. 3,696,868, issued October 10, 1972, on an application filed December 18, 1970. These copied claims are identical to those on appeal. The '840 application has an effective filing date which is apparently subsequent to Taylor's. Although none of these matters is before us as part of the record certified by the PTO,

cf. 35 U.S.C. §§ 143, 144, CCPA Rule 4.2, appellant and the solicitor base their positions on these matters as did the examiner and the board, so we shall take them as facts in this appeal.

An interference was declared between Taylor and the '840 application on one count. (No. 98,609.) The record contains papers relating to appellant's motion in the interference under Rule 231(a), 37 CFR 1.231(a),[2] to substitute the application here on appeal for the '840 application. No decision has yet been made on this motion, and interference has been suspended, to await resolution of this appeal. Appellant's desire to retain the copied claims in both applications until the motion to substitute is decided is the prime motivation for this appeal.

## The Rejections

All the appealed claims were rejected by the examiner on the ground of same-invention type double patenting, 35 U.S.C. § 101, on the corresponding claims in the '840 application.

The examiner relied on Manual of Patent Examining Procedure § 822.01[3] in his second rejection of the claims and explained in the Examiner's Answer:

Applicant has received one or more actions on each set of claims and it appears

that the applications and claims have had due consideration. Applicant is placing an excessive burden on the office by continuing prosecution of numerous sets of claims and consequently the double patenting rejection should be sustained.

The board agreed and in apparent recognition of the provisional nature of the rejection indicated, pursuant to Rule 196(c), 37 CFR 1.196(c), that appellant could overcome the rejection by cancelling the corresponding claims from the '840 application.

Claims 42, 44, and 46, which are verbatim copies of Taylor's claims, were rejected under 35 U.S.C. § 112 as lacking sufficient supporting disclosure and under 35 U.S.C. § 132 for new matter (the appealed claims were put in the application by amendment). The § 112 rejections are based on the description requirement of § 112, first paragraph,[4] as enablement and disclosure of best mode have not been questioned. The § 132 rejections are on the same basis.

On claim 42 the board found that the limitation "locking means * * * *spaced* from the operating means and then movable to a position *engaging* the operating means," is not supported in appellant's disclosure because he only discloses locking means in contact, i. e., not "spaced from," the operating sleeve of the valve when not

2. § 1.231 *Motions before the primary examiner.*
 (a) Within the period set in the notice of interference for filing motions any party to an interference may file a motion seeking:
 * * * * * *
 (3) To substitute any other application owned by him as to the existing issue, or to declare an additional interference to include any other application owned by him as to any subject matter other than the existing issue but disclosed in his application or patent involved in the interference and in an opposing party's application or patent in the interference which should be made the basis of interference with such other party.

3. 822.01 *Co-pending Before the Examiner*
 Under rule 78(b) the practice relative to overlapping claims in applications copending before the examiner (and not the result of and consonant with a requirement to restrict, for which see § 804.01), is as follows:
 Where claims in one application are unpatentable over claims of another application of the same inventive entity because they recite

the same invention, a complete examination should be made of the claims of one application. The claims of the other application may be rejected on the claims of the one examined, *whether the claims of the one examined are allowed or not.*
 In aggravated situations no other rejection need be entered on the claims held unpatentable over the claims of the other application. However, any additional claims in the one application that are not rejected on the claims of the other should be fully treated.

4. § 112. *Specification*
 The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

activated by well pressure. The board held that claim 42 has to be construed in light of the disclosure in Taylor, where it originated, which shows a *physical* spacing between the locking means and the operating sleeve in all embodiments.

On claim 44 the examiner and the board found that the specification does not support the limitation "means at the surface for controlling control fluid pressure conducted through said control fluid conductor means to the valve in response to predetermined conditions." The board rejected appellant's contention that under *In re Hawkins,* 486 F.2d 569, 179 U.S.P.Q. 157 (Cust. & Pat.App.1973), he was entitled to rely on a statement in the specification referring to several U.S. patents as showing examples of "Ball-type safety valves * * * [which] have also been used in an attempt to provide automatic closing of wells to prevent well blowouts." The board said that these patents were cited only to show conventional ball-type safety valves and did not disclose means for controlling the fluid which acted "in response to predetermined conditions" as required by the claim. Since claim 44, like claim 42, depends from claim 40, the board also affirmed the rejection of claim 44 for the same reasons given for claim 42.

The examiner and the board found claim 46 to lack supporting disclosure for the limitation "in response to predetermined conditions of flow through the flow conductor and at the well surface," for the reason that appellant did not disclose controlling flow in response to surface conditions.

The board also entered a new ground of rejection on claims 40, 41, 43, and 45, inter alia, as anticipated by U. S. Patent No. 2,998,077, issued August 29, 1961, to Keithahn. Although these claims are not on appeal, this rejection is relevant to some of

appellant's arguments concerning the § 112 and § 132 rejections.

## OPINION

### *Double Patenting Rejection*

As to this rejection, appellant argues, first, that his pending related application is not a "patent equivalent" which can properly afford the basis for a double patenting rejection and, second, that the facts of this case demonstrate "good and sufficient reason," under Rule 78(b), 37 CFR 1.78(b),[5] for the PTO's not requiring elimination of the claims from one of his applications. As authority for the first proposition appellant relies on *In re Hammell,* 332 F.2d 796, 51 CCPA 1469 (1964); *In re Stanley,* 214 F.2d 151, 41 CCPA 956 (1954); and *Ex parte Apgar,* 66 U.S.P.Q. 370 (Bd.App.1944).

■ We do not subscribe to appellant's no "patent equivalent" theory, and we do not view *Hammell, Stanley,* and *Apgar* as establishing such a principle, whatever it may be. We are not aware that "patent equivalent" is a recognized term of art in patent law, and we will not create new terminology without good reason. In light of the purpose of this rejection, which this court explained in *In re Wetterau,* 356 F.2d 556, 558 n. 2, 53 CCPA 916, 918 n. 2 (1966),[6] we see no harm to appellant in the PTO's bringing to his attention what it will do if the claims on appeal issue in the '840 application after the interference concludes.

■ However, the manner in which this rejection was maintained below requires that it be reversed, since the examiner and the board have, in effect, made the rejection final rather than provisional. In Rule 78(b), supra, the Commissioner has stated that he may "require" elimination of conflicting claims from all but one application of the same applicant. "Require-

---

5. § 1.78 *Cross-references to other applications.*

 \* \* \* \* \* \*

 (b) Where two or more applications filed by the same applicant contain conflicting claims, elimination of such claims from all but one application may be required in the absence of good and sufficient reason for their retention during pendency in more than one application.

6. "The \* \* \* practice appears to benefit both the applicant and the Patent Office, the former because he is made aware of the possible existence of 'double patenting' at an early date and has an opportunity, if he so desires, to elect which application to let issue, and the latter because of the hastening of the prosecution."

ments" are not reviewable by the board or by this court unless they amount in fact to rejections. *In re Haas,* 486 F.2d 1053, 179 U.S.P.Q. 623 (Cust. & Pat.App.1973). Consequently, it is not ordinarily within our province to decide whether an applicant has presented "good and sufficient reason" for retaining conflicting claims in more than one application. In this case the PTO has chosen to view its action as a "rejection," and by refusing to permit further prosecution of the appealed claims in this application without the performance by appellant of an act wholly extrinsic to this application has, in legal effect, rejected these claims finally. The interference and appellant's pending motion to substitute applications provide "good and sufficient reason" to permit the claims to remain in both applications for now. To force appellant to cancel claims in the '840 application before a decision on his motion to substitute would effectively deprive appellant of the opportunity to avail himself of Rule 231(a)(3), supra. We intimate no opinion on what the PTO should do once the motion is decided. By making the rejection final the PTO has "jumped the gun," and we cannot permit its decision to stand unrevised.[7]

We have trouble understanding the PTO's stated rationale for making the double patenting rejection final at this time. Once the provisional rejection has been made, there is nothing the examiner and the applicant must do until the other application issues. We see no undue burden here. There is no question, of course, that a double patenting rejection would be proper if one of appellant's applications issues. The effect of our reversal is merely to maintain co-pendency of these claims. An affirmance under the circumstances of this case would result in the automatic abandonment of these claims upon the receipt of our mandate by the PTO since appellant has

refused to cancel the corresponding claims from the '840 application, and that result is legally untenable. The rejection of claims 39, 42, 44, 46, 50, and .57 for double patenting is reversed.

### *The § 112–§ 132 Rejection*

■ The issue under this heading is whether appellant's specification, construed in light of the knowledge of those skilled in this art, contains a written description of the subject matter of claims 42, 44, and 46. *In re Smith,* 481 F.2d 910, 178 U.S.P.Q. 620 (Cust. & Pat.App.1973); *In re Smythe,* 480 F.2d 1376, 178 U.S.P.Q. 279 (Cust. & Pat. App.1973); *In re Ruschig,* 379 F.2d 990, 54 CCPA 1551 (1967). The evidence upon which appellant may rely to show what meaning persons skilled in the art would attribute to his disclosure for the purposes of § 112 and § 132 is that which pertains to the *public* knowledge extant on appellant's effective filing date, which in this case is September 14, 1970. *In re Glass,* 492 F.2d 1228, 181 U.S.P.Q. 31 (Cust. & Pat.App. 1974).

■ Appellant has argued this issue as the "right to make" issue, as if this application were already in the interference with Taylor. The general tenor of his argument is: "My disclosure is as good as Taylor's, so if he is entitled to the claims then so am I." We note that this is *not* the same argument that was made in cases like *In re Waymouth,* 486 F.2d 1058, 179 U.S.P.Q. 627 (Cust. & Pat.App.1973), *modified on rehearing,* 489 F.2d 1297, 180 U.S.P.Q. 453 (Cust. & Pat.App.1974). Appellant's position differs from that of the appellants in *Waymouth* in that appellant here asserts that he has not only the right *to try* to take Taylor's claims *away* from him but also has the right to *have them himself* in a patent. The issue here is the adequacy of appellant's disclosure, not Taylor's.[8] Merely be-

---

7. Neither *Hammell* nor *Wetterau,* supra, appears to involve the special circumstances of this case, and there is no indication in either case of the applicant being "whipsawed" between applications as appellant is here. See

also *Ex parte Feister,* 53 O.G. 1089, 1890 C.D. 167, which the court discussed in *Wetterau.*

8. In ex parte prosecution the claims must be given the broadest reasonable construction

cause Taylor has received a patent containing these claims does not require the PTO to find that appellant has support for them in a different disclosure. See *In re Giolito,* 530 F.2d 397, 400, 188 U.S.P.Q. 645, 648 (Cust. & Pat.App.1976), and cases cited therein. Appellant's application must contain sufficient disclosure, expressly or inherently, to make it clear to persons skilled in the art that appellant possessed the subject matter claimed. *In re Smythe,* supra. See also *In re Molins,* 368 F.2d 258, 261, 54 CCPA 790, 793 (1966).

■ We agree with appellant that his application discloses an embodiment in which the locking means is initially spaced from the valve operator means in the inoperative position and is movable to a position engaging the operating means to lock the valve in an open position, as required by claims 42 and 44. The PTO argues, on the basis of the Taylor disclosure, that the *en-*

*tire* locking means must be *physically* spaced from the valve operator at all times the valve is not locked open. This position does not give appellant the benefit of the broad construction to which his claims are entitled. There is no dispute that some *parts* of the locking means are in sliding contact with the valve operator sleeve in all of appellant's disclosed embodiments. However, "locking means" is a sufficiently inclusive term, not given any special meaning by the disclosure, that it can read on not only *all* structures in the valve that contribute to the locking function but also merely the *single* part or group of parts which engages and holds the operator sleeve when the value is locked open.

Figs. 1B and 2B, in the application, showing the valve in the unlocked and locked positions, respectively, read in conjunction with the relevant parts of appellant's specification, quoted infra, describe the disputed limitation:

their language will permit, and an applicant who uses broad language runs the risk that others may be able to support the same claim with a different disclosure. See *Hemstreet v.*

*Rohland,* 433 F.2d 1403, 58 CCPA 743 (1970). This broad construction, of course, is to appellant's benefit.

The downward movement of the piston 48 [in response to control fluid pressure] acts to move the locking sleeve 54 downwardly and also the radially expansible detent ring 53 downwardly so that the ring 53 becomes laterally aligned with the locking recess 56 and expands outwardly into such recess 56. The spring 55 exerts a constant upward force on the sleeve 54, but when the detent 53 has expanded outwardly into the recess 56, the spring 55 does not have sufficient force to unseat the locking ring 53 from the recess 56. Therefore, the detent ring

53 is locked in the recess 56 and prevents the sleeve 54 from moving upwardly. Since the sleeve 54 is in engagement with the annular ring 58 which in turn engages the shoulder 59 of the sleeve 30, the sleeve 30 is thereby locked in its lower position by the detent ring 53 being in the locking recess 56.

The foregoing indicates that the detent ring 53 is the ultimate means by which operator sleeve 30, through the action of the locking sleeve 54 sliding into firm contact with the annular ring 58, is locked. The engagement of the "locking means" and the "operating means" takes place when ring 53 slides from a position distant from recess 56, as shown in Fig. 1B, where it performs no locking function, to the position shown in Fig. 2B, where it engages recess 56. In the inoperative position (Fig. 1B) the locking sleeve 54 is spaced from the annular ring 58 (which at all times touches the operator sleeve 30); in the locked position (Fig. 2B) the locking sleeve has moved into contact with the ring, thereby holding the operator sleeve in position. We are of the opinion that this disclosure is sufficiently clear to show that appellant invented subject matter displaying features within the broad scope of the disputed limitation; the use of means-plus-function language and such broad terms as "spaced" in claims increases the likelihood that persons other than the originator of the claim language will have made the same broad invention. The rejection of claim 42 is, therefore, reversed, and part of the basis of the PTO's rejection of claim 44, which has common dependency with claim 42 from claim 40 wherein the above limitation appears, is eliminated.

Claim 44 contains the further limitation (appearing in claim 43) "means at the surface for controlling control fluid pressure conducted through said control fluid conductor means to the valve in response to predetermined conditions," which the examiner and board felt was not described by appellant because his specification describes no structure upon which this limitation would read. As we said in *In re Smith,* supra, it does not matter under § 112, first paragraph, *how* the specification describes the specific subject matter he later claims. The specification must merely do so in *some* way in order to comply with the description requirement. Accordingly, appellant need not have disclosed specific structures in order to have described the invention of claim 44 if his disclosure is otherwise adequate to show that he did in fact possess that subject matter. Appellant's specification contains the following (emphasis ours):

The present invention relates to a ball-type safety valve which is adapted to be placed down-hole in a well tubing for normally functioning to close off any flow of oil through the tubing *when the fluid pressure in the well reaches a predetermined point.* * * *

* * * * * *

* * * In order to open the valve, control fluid under pressure is supplied selectively *from the surface* * * *.

* * * * * *

* * * To return the ball valve B to the closed position automatically when the well pressure reaches a predetermined point, such well pressure below the ball valve B must be sufficiently high to overcome the control fluid pressure..

Allowed claim 3, which was part of the application as originally filed and is thus available as original disclosure, *In re Anderson,* 471 F.2d 1237, 176 U.S.P.Q. 331 (Cust. & Pat.App.1973), recites "control fluid pressure actuated means * * * [having the purpose] to establish a predetermined pressure * * * [at which] to close said valve." In view of these disclosures, we disagree with the board's conclusion that the subject matter of claim 44 was not fully described and reverse the rejection.

The portion of claim 46 (appearing in claim 45) on which the examiner and board focused their attention is the limitation requiring "controlling flow * * * in response to predetermined conditions of flow through the flow conductor and at the well surface." The PTO concedes that appellant describes the control of flow "in response to predetermined conditions of flow through the flow conductor" but main-

tains that appellant does not disclose any control in response to conditions "at the well surface."

Appellant Mott analyzes the evidence and states his argument as follows (original emphasis):

> As Mott must inherently have a surface means and such surface means are known to be responsive to well pressure at the surface, Mott's disclosure is equally supportive of the surface flow responsive means as either Keithahn or Taylor, since such earth surface located "automatic" controllers responsive to well *pressure* are *enablingly* disclosed in * * * [two prior art] patents.

Appellant refers to a disclosure "void" on this point in Taylor, in which the claim originated, and notes that the only disclosure in Keithahn which could be considered the basis for holding claim 45, which contains the limitation, anticipated (which holding was made) refers solely to "automatic" control means.[9]

 Taylor, which issued after the filing date of appellant's application, is not evidence of how persons skilled in the art would view appellant's disclosure, *In re Glass,* supra, and, as we have already said, the adequacy of Taylor's disclosure is not before us. Keithahn, however, issued well before appellant's filing date and may be so used. Reading all of Keithahn as well as just the portion above quoted in note 9, on which appellant relies, belies appellant's arguments. First, Keithahn refers specifically to events affecting well integrity occurring at the surface connection of the well or on the surface of the earth around the well against which his invention provides protection. Contrary to appellant's argument, Keithahn's disclosure shows much more than automatic control means as the basis of the anticipation rejection of claim 45 by the board. Second, Keithahn's disclosure does little to support appellant's inherency

argument because of its disclosure additional to mere description of automatic control means as an object of the invention. That Keithahn considered *his* valve to possess the function of response to well (and earth) surface conditions does not require the conclusion that a person skilled in the art would read appellant's mere description of automatic control means as encompassing the same function, i. e., response to conditions at the well surface, to show possession of the invention by appellant. The rejection of claim 46 under § 112 and § 132 is affirmed.

### Conclusion

The decision of the board is *affirmed* as to claim 46 and *reversed* as to claims 39, 42, 44, 50, and 57.

*MODIFIED.*

---

9. "An object of the invention [says Keithahn] is to provide an improved subsurface well apparatus that *automatically* shuts off the well production in the well bore upon the development of a particular adverse condition or adverse conditions in or around the well, such as breaking of the surface connections due to weather conditions, enemy action, or the like." [Emphasis added.]