**TECHNICON INSTRUMENTS CORP., Plaintiff,**

v.

**ALPKEM CORPORATION, Defendant.**

Civ. No. 85–1564–PA.

United States District Court, D. Oregon.

Sept. 11, 1986.

Paul R. Gary and Christopher H. Kent, Bullivant, Houser, Bailey, Hanna, Pendergrass, Hoffman, O'Connell & Goyak, Portland, Or., Eugene Moroz, Kurt E. Richter, William S. Feiler and Michael P. Dougherty, Morgan & Finnegan, New York City, for plaintiff.

George K. Meier, III, Hardy Myers, Paul S. Angello and Joseph D. Cohen, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for defendant.

## OPINION

PANNER, Chief Judge.

Plaintiff Technicon Instruments Corporation ("Technicon") brings this patent infringement action against defendant Alpkem Corporation ("Alpkem"). Plaintiff asserts that Alpkem's RFA–300 liquid analyzer infringes U.S. Patent No. 3,804,593 ('593). The '593 patent applies to continu-

ous flow analysis of liquid samples. It issued April 16, 1974 to William J. Smythe and Morris H. Shamos as inventors. The patent application was filed May 25, 1964. Technicon, a New York corporation, is the assignee. I find for the defendant.

Alpkem denies that the RFA–300 infringes the '593 patent. It further contends that the '593 patent is invalid for the following reasons: (1) that Technicon, in prosecuting the '593 patent application, committed fraud or engaged in inequitable conduct by violating its duty of disclosure, set forth in 37 C.F.R. § 1.56(a) pursuant to 35 U.S.C. §§ 131 and 132; (2) the apparatus and methods described and claimed in the '593 patent are inoperative in violation of 35 U.S.C. § 101; and (3) the '593 patent's disclosures are inadequate or nonenabling or both, to allow a person of ordinary skill in the art to practice the alleged invention. Alpkem also asserts the defense of patent misuse and filed antitrust and unfair competition counterclaims. These claims were severed and stayed pending the trial of this phase of the action. The issue of Technicon's damages was also severed from this part of the trial.

A court trial was held. This opinion constitutes findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). Alpkem's RFA–300 does not infringe the '593 patent. Although the apparatus and methods claims in the '593 patent were operative and useful at the time of the application, the patent is invalid because it did not contain adequate disclosure and because Technicon engaged in inequitable conduct in prosecuting the patent application.

## FACTS

1. *Background.*

The '593 patent is entitled "Automatic Analysis Apparatus and Method." It is concerned with a method of analyzing samples called continuous flow analysis ("CFA"). The patent states that it especially relates to the analysis of substances in the blood and other body fluids. CFA involves drawing samples into a tube and mixing the sample with a reagent. The

mixture changes color or intensity in relation to the amount of a known substance in the sample. It then flows through a flow cell where the change in color or intensity of each sample is measured by a colorimeter. The colorimeter output is recorded on a graph by a stylus.

Dr. Leonard Skeggs introduced the use of air bubbles to separate samples in the flowing stream in 1957. A key aspect of the Skeggs system is the division of each sample slug into many segments by intrasample air. This intrasample air is accurately and reliably pumped into the flowing stream. The air was then removed (debubbled) before the samples were passed to the flow cell for measurement. The Skeggs system incorporated a "wash" cycle between samples. It is a "wetted" system.

Dr. Skeggs obtained patents for many of his inventions. Technicon was the assignee of many of his patents and commercialized the Skeggs system as the AutoAnalyzer ("AA"). In 1957 this system became the first commercially available automatic CFA equipment.

The conventional art prior to the '593 patent was commercialized as the AA and later as the SMA. (A later version was called the "SMAC.") They operated as "wetted" systems. "Wetting" generally means the adherence of a liquid to the walls of a conduit. In a "wetted" CFA system the walls of the conduit which the sample flows through are "wetted" either by the sample or by added surfactants. This wetting forms a thin film on the conduit and helps create a smooth flow in the conduit. Wetted CFA systems require intrasample segmentation by bubbles to help minimize contamination. A wash is used between samples to cleanse the system and reduce intersample contamination.

In a wetted system, all measurements of all sample segments flowing through the conduit were recorded. It took a number of the segments flowing through the conduit to reach a "steady state" so clinicians feel comfortable measuring the sample reached. The segments flowing through the conduit before the steady state was reached were essentially used to wash the

system. Because each segment was recorded, the recording on a wetted system generally was in the form of an S curve.

Contamination in a CFA system means the carryover or mixing of each sample segment with the liquid film left on the walls of the conduit by the previous sample. Sample segments passing through the conduit prior to reaching the steady state mix with the film from the previous sample. After a number of these segments have passed through the conduit, they cleanse it so that only the current sample is being measured.

The amount of contamination (or wash) in the wetted system presented problems for users of CFA systems. The contamination in the wetted system, the need for many intrasample bubbles and the consequent debubbling process slowed down analysis and limited the instrument's speed and precision. The wetted system also required relatively large quantities of samples and reagents.

## 2. *Development of the '593.*

Mr. Smythe began working as a researcher with Technicon in 1960. Dr. Shamos was hired as a scientific advisor to Technicon in 1964. The two men began working together in 1964. In October of 1961, Mr. Smythe theorized the debubbler might be contributing to the contamination of the system and that elimination of the debubbler would be helpful. In March 1964 they theorized that the real problem with wash in the conventional CFA system was with the flow cell and, more importantly, with the debubbling device. They filed the patent application in May 25, 1964. Following a number of amendments and rejections, including an appeal to the CCPA, the '593 patent issued on April 16, 1974.

The specification and preferred embodiment of the '593 patent describe a nonwetted system. In theory, a nonwetted system is one in which the conduits are made of material which is not wetted by either the sample segments or the segmentizing fluid. The film on the inside of the conduits between the sample segments that is present

in a wetted system is missing and the output is a square wave form as opposed to the S curve that is generally seen in a wetted system.

The key difference between a wetted and nonwetted system is the presence or absence of film on the inside of the conduit which results in the characteristic difference in the output record. Although a totally nonwetted system exists in theory only, I find that wetted and nonwetted systems are based on significantly different principles of operation and involve fundamentally distinct methods and materials for performing CFA.

Because there is little or no contamination or film left in a nonwetted system, there is no need for the many intrasample segments to act as a wash as in the wetted system. The intersample bubbles in a nonwetted system are introduced at the sampler probe rather than by a pump as in a wetted system. Because of the need for many intrasample bubbles in a wetted system, the sample segments in the wetted system tend to be smaller than those in the nonwetted system.

### 3. *Specification.*

The '593 patent states that the primary object of the invention is to improve the precision of the analysis of the samples of liquid. It states that this object can be accomplished by using "as much as possible, liquid conduits, such as Teflon tubing, which have non-wetting surfaces...." '593 Patent, Col. 1. It goes on to state that "the sample liquid which is transmitted through the flow cell during the analysis operation ... has a volume at least as large and preferably larger than the volume of the flow cell, so that there is no air in the flow cell when the liquid analysis operation is being performed." *Id.* The specification goes on to state that it is unnecessary to remove the bubbles in the stream before the treated liquid goes through the flow cell, "since the segmentation of the liquid stream by air bubbles is such that a sufficient volume of the treated sample liquid is devoid of air bubbles...." *Id.* The specification states that another

object of the invention is to provide both apparatus and method of analysis so that the measurement of the analysis of each sample is indicated "substantially instantaneously during the flow of the treated sample through the flow cell, to the extent that the recorder is able to provide such substantially instantaneous recording, so that the trace on the recorder chart has a square wave form." *Id.*

The specification shows some major differences between the prior wetted CFA systems and the system described in the specification: (1) the use of a conduit tubing such as Teflon, with a nonwetting surface; (2) sample segments as large as the flow cell; (3) the removal of the debubbler; and (4) instantaneous chart recording in a square wave form.

### 4. *Preferred Embodiment.*

The preferred embodiment of the '593 patent describes the best mode of the invention as operating in essentially the following manner.

An indexible table carries several liquid sample containers. A probe can be controlled to dip into the sample liquid and withdraw a portion of the sample into the conduit where suction is created by a peristaltic pump. The probe lifts from the sample and aspirates air, and then returns to the sample liquid and withdraws another sample. This is called "pecked" sampling. The sample which is drawn is referred to as a single sample segment. This "single" sample segment actually consists of a short leading segment followed by a longer following segment. In the preferred embodiment the conduits are made of Teflon.

While the sample liquid is being withdrawn, a reagent liquid is also drawn into the conduit. This reagent can flow either as a steady stream or as an air segmented stream. The reagent and sample streams are then combined to form a stream consisting of treated sample and air bubbles. This is where in the conventional wetted system the intrasample segments are pooled and then debubbled. However, in the invention, the stream of liquid treated sample and air bubbles are passed directly

through the sight passageway of the flow cell of a colorimeter. Each sample which is to be measured has a volume at least equal to the sight passageway volume. In this way, the liquid can be measured without the presence of air bubbles which would interfere with the measurement. The chart recorder operation is interrupted when a bubble enters the flow cell so that the chart recording does not contain the bubble "artifact" attributable to the presence of air in the flow cell.

5. *The RFA-300.*

In about 1983, Alpkem hired Dr. Charles J. Patton, its current Director of Research and Development. He was responsible for the development of the RFA-300. Dr. Patton holds a B.A. in chemistry, an M.S. in analytical chemistry, and a Ph.D. in analytical chemistry. In about 1976, Dr. Patton became familiar with Technicon's SMAC instrument through the literature. He had never seen the '593 patent until about March 1984.

I find that the design of the RFA-300 is based on the performance of CFA in a wetted system. In the RFA-300 a pump and a sampler propel liquid samples alternately with wash solution through the withdrawal tube and conduit. The sample and wash solutions are separated from one another by small, intersample bubbles which are formed at the pump and withdrawal tubes. The reagent combines with the sample and this analytical stream is divided in intrasample segments by air bubbles. This intrasample air is introduced into the stream by the use of an air bar which pumps the air into the stream at precise intervals. The RFA-300 sampler draws a quantity of sample that can combine with about thirty segments of reagent. The resulting segments that consist of combined sample and reagent are basically the same length. There are typically thirty segments of each sample that flows through and are measured by the RFA-300. The intersample air bubbles originally introduced into the sample line do not affect the measurement of the sample because the bubbles are so small. The air is simply carried along through the entire op-

eration of the system. The segmented sample stream flows directly through the flow cell. The intrasample air bubbles do not affect measurement of the sample only because each sample segment has a length equal to the volume of the flow cell.

The recorder receiving the detector signal data is never interrupted. The RFA-300 uses a bubble gating mechanism at the flow cell which electronically discriminates between air and liquid segments. The photodetector operates continuously and senses the presence of air bubbles in the flow cell. It only records part of the signal measure when the flow cell is completely filled with a liquid segment. The signal given for one sample segment resembles a square wave; however, the recorder trace for the entire sample, which includes about thirty intrasample segments and fifteen wash solution segments, generally rises (washes in), levels off (achieves steady state), and gradually falls (washes in). This results in a recording that appears to be similar to an S curve.

Technicon asserts that the "heart" of its invention is the removal of the debubbling step used in the prior art and notes that the RFA-300 does not use a debubbling device. Technicon therefore asserts that the absence of the debubbler alone shows that Alpkem's device is infringing. Technicon also asserts that other characteristics of the alleged infringing machine indicate that it infringes the '593 patent.

Technicon asserts that the RFA-300 includes the same basic elements mentioned in the preferred embodiment. Technicon notes that the RFA-300 uses wettable conduits but asserts that they were conventional at the time and that the patent covers both wetted and nonwetted systems. Alpkem asserts that the patent can only apply to a nonwetted system for reasons that will be discussed below and therefore asserts that it does not infringe the '593 patent.

Technicon asserts that the RFA-300 literally infringes the '593 patent because the RFA-300 uses an intermittently indexible sample table to sequentially present sam-

ples to an off-take probe. The probe dips in and out of the sample cup to withdraw a stream of liquid samples spaced apart by air segments. The RFA–300 also has a colorimeter which includes a flow cell with means for analyzing the liquid samples passing through the sight passageway. The stream of liquid samples in the RFA–300 passes through the sight passageway of the flow cell without debubbling and the RFA can use a liquid segmentizing fluid. Technicon asserts that these characteristics of the RFA–300 infringe claims six and seven of the patent.

Technicon also asserts that the RFA–300 infringes the patent because it uses the "pecked" sampling system of drawing more than one sample segment from each sample cup as defined in claims two, three, four, twelve, and thirteen. Technicon asserts that claims eight, nine, and ten are infringed because the RFA–300 uses a bubble gating circuit which holds the recorder stylus at its last position when a bubble is present in the flow cell sight passageway and is responsive only when the flow cell is completely filled.

I find the RFA–300 differs from the non-wetted system described in the '593 preferred embodiment in the following ways: (1) the RFA–300 uses surfactants; (2) the RFA–300 uses a wash between samples; (3) the RFA–300 divides the sample into many segments; (4) the RFA–300 uses an air bar; (5) the RFA–300 uses bubble gating at the flow cell; (6) the RFA–300 measures concentrations from many segments of wash and sample; and (7) the RFA–300 graph is not in square wave form.

## DISCUSSION

### A. *Infringement.*

■ The patent owner has the burden of showing by a preponderance of the evidence that the accused device infringes the patent. *Hughes Aircraft Co. v. United*

States, 717 F.2d 1351, 1361 (Fed.Cir.1983).[1] In general a finding of infringement depends on whether the accused device falls within the scope of the asserted claims as properly interpreted. *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 770 (Fed.Cir. 1983). The first step is to construe the patent and determine the scope of the claims. *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1118 (Fed. Cir.1985). In determining infringement the claims must be interpreted and then compared with the accused device. A claim is construed in the light of the claim language, the prior art, the prosecution history, and the specification. *Id.* at 1118. However, that the claims are interpreted in light of the specification does not mean that everything in the specification should be read into them. *Id.* at 1121.

A claim cannot be interpreted without going beyond the patent claims. *Autogiro v. United States*, 384 F.2d 391 (Ct.Cl.1967). In deriving the meaning of a claim, the court should inspect all useful documents and then reach the "felt meaning" of the claim. *Id.*

Technicon asserts that Alpkem infringes all of patent claims one through thirteen except for claim five. Only claims one, six, seven, ten, and eleven are independent claims.

### 1. *The '593 Patent Claims.*

■ When more than one claim is presented, the claims may be placed in dependent form, in which a claim may refer back to and further restrict a single preceding claim. Claims in dependent form shall be construed to include all the limitations of the claim incorporated by reference into the dependent claim. 37 C.F.R. § 1.75(c).

Claim one provides:

1. A method of automatic quantitative analysis of a plurality of liquid samples each disposed in a respective con-

1. Under 28 U.S.C. § 1295(a)(1), the United States Court of Appeals for the Federal Circuit has exclusive jurisdiction over appeals from the United States District Courts in patent cases. Decisions of that court are binding on this court. The Court of Appeals for the Federal Circuit has adopted as binding precedent the holdings of the United States Court of Claims and the United States Court of Customs and Patent Appeals ("CCPA"). *South Corporation v. United States*, 690 F.2d 1368 (Fed.Cir.1982).

tainer, wherein said samples are off-taken by an off-take device and are transmitted successively as a flowing stream to an analytical device including a flow cell having a sight passageway, said method including:

for each sample container in succession, coupling said off-take device to such sample container, and in alternation therewith, to a source of an inert fluid immiscible with said liquid samples, thereby to take-off a segment of each of said liquid samples and intermediate segments of the inert fluid; transmitting said segments of the liquid samples and inert fluid as a flowing stream to said analytical device; and

passing said flowing stream including segments of both the liquid samples of inert fluid through the sight passageway of the flow cell, the volume of at least one homogeneous portion of each liquid sample being at least equal to the volume of the sight passageway of the flow cell.

Claim one teaches the measure of a segment of the sample. I find this claim can only be read as applying to the single sample segments in a nonwetted system.

Claim six provides:

6. Apparatus for the automatic quantitative analysis of a plurality of liquid samples each disposed in a respective container, comprising:

an indexible table for supporting said sample containers,

off-take means including an off-take tube coupled to a pump means,

means for intermittently indexing said table to sequentially present each of such containers to said off-take means,

means for inserting said off-take tube into a presented thereto container and alternatively exposing said off-take tube to the atmosphere;

whereby said pump means draws through said off-take tube a flowing stream of successive liquid samples spaced apart by intermediate segments of air;

colorimeters means including a flow cell having a sight passageway and associated means for analyzing liquid samples passing through the sight passageway of the flow cell; and

conduit means for passing the flowing stream of successive liquid samples spaced apart by intervening segments of air through the sight passageway of the flow cell.

Claim six is an apparatus claim which generally provides for the apparatus disclosed in the preferred embodiment. It eliminates the debubbler which would have been found in the conventional prior art. It also provides for the introduction of air only at the probe. Only the intersample air used in a nonwetted system can be introduced at the probe. It never speaks of drawing more than one segment or of dividing the segment after intake. Therefore I find that claim six teaches a nonwetted system.

Claim seven provides:

7. Apparatus for the automatic quantitative analysis of a plurality of liquid samples, said apparatus comprising:

a colorimeter including a flow cell having a sight passageway and an inlet and an outlet through which liquid samples are transmitted for the quantitative analysis thereof in respect to the same known ingredient in each sample,

conduit means for the passage of the liquid samples through the sight passageway of said flow cell,

means for introducing a sample treating liquid and a segmentizing, inert, immiscible, fluid into said conduit and thereby forming in said conduit means at a location upstream of said flow cell a fluid stream containing segments of treated sample liquid spaced from each other in the direction of stream flow by intervening immiscible fluid segments,

said conduit means having an outlet connected to said inlet of said flow cell and devoid of other openings downstream of said upstream location to pass said fluid stream including treated liquid samples and said immiscible

fluid segments through said sight passageway of said flow cell for analysis of said treated liquid samples with said accompanying cleansing of the sight passageway by said segmentizing fluid; and

means for measuring the optical density of said treated liquid samples passing through said sight passageway.

Claim seven teaches the separation of each sample from the next after intake with an "immiscible fluid" for that purpose. It never mentions dividing a segment after intake or drawing more than one segment. Therefore, I find that it only provides for the measurement of one sample segment.

Claim ten provides:

10. A method of automatic quantitative analysis of a plurality of liquid samples each disposed in a respective container, wherein said samples are off-taken by an off-take device and are transmitted successively as a flowing stream to an analytical device including a colorimeter having a flow cell with a sight passageway, said method including:

for each sample container in succession, coupling said off-take device to such sample container, and in alternation therewith, to a source of an inert gas immiscible with said liquid samples, thereby to off-take a segment of each of said liquid samples and intermediate segments of the inert gas;

transmitting said segments of the liquid samples and inert gas as a flowing stream to said analytical device;

passing said flowing stream including segments of both the liquid samples and inert gas through the sight passageway of the flow cell, the volume of at least one homogeneous portion of each liquid sample being at least equal to the volume of the sight passageway of the flow cell;

measuring the optical density of the liquid samples passing through the sight passageway of the flow cell; and

interrupting the operation of said recorder except when said portion of each sample having a volume at least equal to the volume of the sight passageway of the flow cell is in the sight passageway.

Claim ten is a method claim that speaks of off-taking a segment of the sample. This shows, as in claim one, that the claim only applies to measurement of only a single sample segment, as in a nonwetting system. It also teaches the interruption of the operation of the recorder except when a part of each sample which has a volume at least equal to the sight passageway is in the passageway.

Claim eleven provides:

11. A method of automatic quantitative analysis of a plurality of liquid samples each disposed in a respective container, wherein said samples are off-taken by an off-device and are transmitted successively as a flowing stream to an analytical device including a flow cell having a sight passageway, said method including:

for each sample container in succession, coupling said off-take device to such sample container, and in alternation therewith, to a source of an inert gas immiscible with said liquid samples, thereby to off-take a segment of each of said liquid samples and intermediate segments of the inert gas;

transmitting said segments of the liquid samples and inert gas as a flowing stream to said analytical device;

passing said flowing stream including segments of both the liquid samples and inert gas through the sight passageway of the flow cell, the volume of at least one homogeneous portion of each liquid sample being at least equal to the volume of the sight passageway of the flow cell.

Claim eleven contains the same operative language as claim ten but omits the claims relating to the interruption of the recorder. It speaks of taking a segment of the liquid samples. This again shows that the claim only applies to the one sample segment, typical of a nonwetted system.

■ Claims two and three incorporate claim one by reference and thereby incorpo-

rate all the limitations of that claim. 37 C.F.R. § 1.75(c). They both must then incorporate the teaching of claim one that only one sample segment is withdrawn. In addition, claim two speaks of dividing the sample by the use of an inert fluid. Claim four is dependent on claim two and so also incorporates the claim one limit that only one sample segment is measured. Claim four also specifically speaks of dividing each sample into one leading segment of relatively short length and a following segment of relatively long length. This describes the nonwetted intersample segmentation used by the inventors.

Claim eight is dependent on claim seven. It also provides a means for interrupting the operation of the chart recorder except when the sight passageway is fully occupied by a treated liquid sample with a volume at least equal to the volume of the sight passageway.

Claim nine is dependent on claim six and contains the limitations contained in that claim. It also provides for the interruption of the chart recorder.

Claim twelve is dependent on claim eleven and contains the limitations contained in that claim. It provides for dividing each sample by further inclusion of inert gas introduced at the point of introduction of the liquid samples into the flowing stream. These appear to be the type of intrasample bubbles pumped into the flowing sample stream in the Skeggs wetted system.

Claim thirteen is dependent on claim twelve and provides for introducing air into the sample stream at the probe, which can only address the intersample bubbles used in a nonwetted system.

All of the independent claims can only be construed as applying to the nonwetted system invented by Mr. Smythe and Dr. Shamos. Claims one, six, seven, and ten teach the measurement of only one segment of a sample, of introducing air at the probe which will only produce the intersample segments used in a nonwetted system and will not produce the intrasample segments necessary for a wetted system. Claims ten and eleven teach of the interruption of the chart recorder when the flow

cell is not filled with a volume of sample liquid. Claim seven teaches of the use of an immiscible fluid for separating the samples.

 The RFA–300 uses the multiple sample segments and intrasample bubbles necessary in a wetted system. It operates as a wetted system and does not use an immiscible fluid for separating the samples. The RFA–300 chart recorder operates continuously and is not interrupted, unlike claims ten and eleven. Therefore, the RFA–300 does not literally infringe any of the independent claims of the '593 patent.

All of the dependent claims, with the exception of claim twelve, contain some of the limitations of the independent claims and either only apply to a nonwetted system or provide for operation of the recorder. Thus the RFA–300 does not infringe literally on any of those claims. However, claim twelve appears to teach the introduction of an inert gas into the flowing stream, much in the way that air is introduced in the RFA–300. Claim twelve reads on the RFA–300.

However, in determining the actual construction of the claim, I must examine the claim language in light of that language, the prior art, the prosecution history, and the specification to attempt to ascertain the "felt meaning" of the claims and any infringement.

2. *The Development Of The '593 Patent.*

Mr. Smythe kept detailed notebooks for his research and experimentation. Dr. Shamos also kept some notebooks concerning the development of the '593 patent. These notebooks provide an insight into how the patent developed.

On October 18, 1961 Mr. Smythe discussed removing the debubbler and passing air through the flow cell. A March 13, 1964 entry by Mr. Smythe states that it is apparent that the real problem is the flow cell and, most importantly, the debubbling device. The March 14, 1964 entry asks: "If the system is nonwetting, why not dis-

card the use of the air except between samples?" Smythe recognized this was a departure from the norm. On March 23, 1964 the inner surface of a coil had become wet which made the experiment unstable. On April 11, 1964 the inventors were facing the problem of how to use a dialyzer (a necessary device for measuring blood samples that must be operated wetted) in the "conventional manner" and the rest of the system in the "new way."

The notebooks show that after March 1964 all single sample measurement segment streams were run in Teflon conduits at least until after the time of the patent application. The only exception was one experiment run on March 25, 1964 in which glass tubing was substituted for the Teflon. Dr. Shamos's notes for that date exclaim it is "clear that nonwetting theory is correct!"

I accept the opinion of Alpkem's expert Dr. Thiers that the glass was used only as a control, that the finding showed that the advantages of the nonwetted conduit system were lost with glass, that the wash was poorer, and that the typical nonsquare wave pattern of the wetted system was restored when glass was used. Dr. Thiers stated he believed the inventors ran a well-designed control experiment and found, as Dr. Shamos exclaimed, that the nonwetted system worked. The inventors went back experimenting with the nonwetted system.

Dr. Shamos was unable to explain that entry in any other way. He was given the opportunity to examine the notebooks and show the court other instances where he mentioned the bubble through flow cell or to point out any entry stating they had found the bubble through flow cell. He never did. Based on my review of Dr. Shamos's notebook and his failure to bring any such entries to my attention, I find there are no further entries in any notebook discussing the bubble through flow cell or exclaiming that the inventors had discovered the bubble through flow cell.

Mr. Smythe stated that, in his work with Dr. Shamos, they discovered that they could reduce the number of air bubbles in a nonwetting system and that this was a new

revelation with very dramatic results in reducing the length of time it took to go from one sample to another.

Mr. Smythe and Dr. Shamos began working together on a nonwetting system and removing the debubbler in 1964. They brought Technicon's patent attorney to view the invention ten days after they decided to eliminate intrasample bubbles. By May 25, 1964 the patent application was filed. The inventors had performed only one control experiment during that time using a wetted system with glass. All of the other experiments during that time period were done with a nonwetted system with Teflon tubing.

Mr. Smythe had conceived of eliminating the debubbler as early as 1961. The only excitement shown in the notebooks in 1964 was regarding the nonwetting system. I find that until the patent application was filed, the inventors conceived of the basis of their invention as the nonwetted system which would then allow the elimination of the debubbler and increase the efficiency of the conventional CFA art.

### 3. *Developments After The Filing Of The '593 Patent Application.*

The patent application was filed soon after the discovery of the nonwetting system and elimination of the debubbler. However, soon after the filing the inventors experienced a number of problems with the nonwetted system. In a January 5, 1965 notebook entry Mr. Smythe wrote:

> How much effort should be put into nonwettability? The only advantage that I even see of going to nonwetted surface is speed of analysis. There are disadvantages. Most important is the friction of the air to liquid surface. This means higher pressures, worse problems with surging.... One very worrisome thing is the requirement of extreme cleanliness. Coupled with this is the gradual wetting of surfaces that start off clean. All these problems spell a real effort and, if they could be solved will take six months of luck.

The problems encountered with the nonwetted system include:

(1) Unavailability of Teflon tubing of extreme smoothness and bore perfection and inability to maintain extreme cleanliness of the Teflon tubing;

(2) Inability to control the bubble pattern breakup or surging caused by friction of the stream on the unwetted walls;

(3) Inability to get proper phasing of the streams and proper proportioning;

(4) Inability to achieve proper phasing of the sampler with the recorder; and

(5) Inability to achieve proper flow cell design.

Some of these problems were solved by the issuance of separate patents as discussed below.[2]

a. *Timing Of Recorder In Relation To Full Flow Cell (Bubble Gating).*

The '593 patent discloses coordination between samples and the recorder to gain measurements of samples only when the flow cell is full of sample and free from air. The patent teaches that the colorimeter's power supply should be completely shut off when an air bubble enters the flow cell. The preferred embodiment of the '593 patent proposes that the flow be timed between the sampler and the flow cell. This required very careful timing, and I find that it would have required more accurate samplers than were available in 1964. Even with an accurate sampler, this procedure could only be useful with the intersample bubbles of a nonwetted system. It would not be helpful in a wetted system. This timing device would cause problems in a wetted system because of unanticipated changes in "dwell time" (the time taken for any sample to go from sample probe to flow cell).

The problems with this device were finally solved by Dr. Shamos, Mr. Smythe, and Gary Griffin when they filed the application for the 3,480,369 ('369) patent on February 21, 1966. The '369 patent issued on November 5, 1969 discloses an apparatus for deactivating the stylus when a gas segment begins to intersect the measuring light through the flow cell and for reactivating the stylus when the gas segment withdraws from the light beam.

I find the '369 patent was a necessary invention because there are so many intrasample bubbles in a wetted system that it would be impossible to use the '593 patent timing device with a wetted system.

b. *Proportioning.*

The '593 patent calls for bubbles to be introduced at the sample probe. Bubbles introduced at the probe are generally too inaccurate to form the air bubbles required for the intrasample segmenting that is generally necessary in a wetted system. In the conventional system, this inaccuracy was not very important because the sample segments were pooled and averaged at the debubbler. However, the elimination of the debubbler made the accuracy of these intrasample bubbles more important.

To help solve this problem, Mr. Smythe developed the "air bar." The air bar proportions intrasample air so the segments are spaced more accurately. Mr. Smythe filed an application for the air bar patent on April 5, 1965. The patent issued as U.S. Patent No. 3,306,229 ('229) on February 28, 1967. I take judicial notice that this patent expired in 1984. *See* 35 U.S.C. § 154 (patent granted for 17 years).

c. *Liquid Segmenting Agent—Bubble Breakup And Surging.*

Dr. Shamos and Mr. Smythe discovered that liquid silicone could be used as a segmenting medium with Teflon to gain needed smoothness and avoid bubble breakup and surging. With Technicon as their assignee, they filed an application for a continuation in part (CIP) of the '593 patent seeking to patent this use of liquid silicone. The CIP patent was applied for on April 14, 1966 and issued as U.S. Patent No. 3,484,-170 ('170) on December 16, 1969. The '170 patent describes the liquid silicone as an intrasample segmenting medium which can

**2.** Both parties presented testimony and opinions of qualified experts to aid in the examination of these complex issues. I find defendant's expert,

Dr. Richard Thiers, to be most credible and knowledgeable.

be passed through the analytic instrument and which cleans the analytic instrument (the flow cell). The liquid silicone acts as a wetting agent with Teflon.

Liquid silicone helped solve surging and bubble breakup in a wetted system but not in a nonwetted system.

### d. *Flow Tube Design.*

The '593 patent does not disclose a specific flow cell design. The standard flow cells used in the AA were glass flow cells. Glass flow cells are a problem in a nonwetted system because of the difference in surface free energy between the Teflon and the glass. The volume of the typical flow cell would be too large for an intra-sample sample segment in a wetted system to fill the flow cell. On August 28, 1964, Mr. Smythe and Dr. Shamos filed for a patent for a colorimeter flow cell. Technicon was the patent assignee. The patent issued on December 24, 1968 as U.S. Patent No. 3,428,053 ('053).

### 4. *Prosecution History.*

■ Alpkem asserts that the prosecution history shows that the '593 patent was limited to a nonwetted system measuring only one segment of each sample. Technicon asserts that any amendments to the claims broadened them and that the history supports its contention that the '593 patent applies to both wetted and nonwetted systems.

The original patent claims were filed on May 25, 1964. The applicants made a number of amendments to the claims prior to any patent office action.

On October 18, 1967 the examiner rejected claims thirty-one and thirty-two under 35 U.S.C. § 112 as lacking a clear basis. He also rejected claims one thru five, eight thru seventeen, nineteen thru twenty-three, and twenty-five thru thirty-three under 35 U.S.C. § 103 as unpatentable over the prior art. The examiner noted that the applicants had simply omitted the gas removal to obtain the obviously beneficial additional cleaning. The applicants amended in response to this rejection.

In 1969, the examiner rejected claims thirty-four thru thirty-six because of the use of the term "repeatedly" when describing the withdrawal of segments from the same sample. The examiner stated the term was too broad because the specification only mentioned two withdrawals from a sample container. A number of the other claims were rejected as being unpatentable over the prior art of Skeggs and Isreeli. Claims forty-one, forty-four, and forty-six were deemed patentable. These claims all deal with claims that the recorder is nonoperational until a sample having a volume at least equal to the volume of the sight passageway of the flow cell fills the cell.

In response to this rejection, the applicants again amended the claims in March 1969. They deleted "repeatedly and successively" from the description of how many times the off-take device dips into the sample container from claim thirty-four (now claim one). They also changed the original language providing that a "plurality of successive segments" of the sample be taken by the sampler to language providing that a "segment of each of said liquid samples" be taken by the sampler.

The original claim one in the 1964 application spoke of a leading and a trailing gas bubble with an intermediate volume of the sample free of the gas and at least equal to the volume of the flow cell with the sample flowing through nonwetted conduits. Clearly claim one had been conceived as involving a nonwetted system and a sample stream divided only by intersample bubbles. The term repeatedly had been added after Technicon was aware of the many problems with the nonwetted system and had filed for patents which would solve some of those problems.

Claim forty-two (now claim six) was also amended in 1969 by deleting "intermittently repeatedly" from the statement describing how many times the off-take tube is dipped into the container and by deleting the phrase "each such sample comprising a plurality of sample liquid segments spaced apart by intermediate segments of air" from a description of the sample stream. The description of the sample stream re-

maining in this claim is "a flowing stream of successive liquid samples spaced apart by intermediate segments of air."

Technicon asserts that these amendments actually broadened the scope of the claims. At trial it offered the testimony of Eugene Rzucidlo. Mr. Rzucidlo held many positions with the patent office, including the position of Examiner-In-Chief to the Board of Appeals from 1983–85. Mr. Rzucidlo testified that, in his opinion, the March 17, 1969 amendments broadened the scope of the claims to include measurement of both single segments and multiple segments of samples. Mr. Rzucidlo also testified that he interpreted the amendments as expanding the scope of the claims to cover both wetting and nonwetting systems.

I reject Mr. Rzucidlo's opinion and find the history of these claims shows that Technicon initially filed the '593 patent to cover only the nonwetted system without the debubbler. As it became more apparent that the nonwetted system could not work, it sought to expand the scope of the claims to cover both a wetted and a nonwetted system. When the examiner rejected the claims in January 1969 as being overly broad, Technicon acquiesced to the examiner's decision and amended the claims finally to cover only a nonwetted system. The prosecution history shows that the claims, as finally amended before the examiner, were limited to cover only a nonwetted system.

Technicon appealed this rejection to the Board of Appeals (the Board). It did not mention its '170 and '141 CIP patents to the Board. The Board's initial rejection of the patent on April 15, 1970 found that there was no means in the specification for introducing either fluids or a gas other than air into the stream. The Board also held that the term "inert fluid" used by the applicants encompassed materials which could adhere to the walls as well as liquid wetting agents, and that both would make the system inoperative. Technicon petitioned for reconsideration on May 15, 1970.

In its reconsideration brief before the Board, Technicon relied on the Kessler Patent No. 3,047,367 ('367) to indicate that

there were immiscible liquids that could be used as a segmenting fluid in the '593 patent. The fluids disclosed as segmenting fluids in the Kessler '367 patent are mineral oil and isoamyl alcohol. Technicon did not disclose that these substances wet Teflon. Technicon also stated in its brief to the Board: "This is certainly a positive teaching that one would not employ, as a segmentizing medium, any material which would adhere to the walls of the conduits or sight passageway of the flow cell." The Board rejected Technicon's motion for reconsideration and Technicon appeals to the CCPA.

In *In re Smythe*, 480 F.2d 1376 (CCPA 1973), the CCPA reversed the decision of the Board of Appeals. The court described the functioning of the invention as one in which "leading segments of the liquid samples, which are arranged in duplicate, one following another, perform, along with the segmenting medium, a cleansing function and each following segment has a volume at least equal to that of the sight passageway." *Id.* at 1377.

The Court reversed the Board's rejection which had been based on the use of the word "inert fluid" to describe a segmenting medium. The court stated:

The use here of any particular "liquids" which would be inoperative, such as the examples given by the board—colored materials, materials adherent to the walls of the sight tube, and liquid wetting agents—would be predictably inoperative in the invention and thus would never be selected by one skilled in the art.

*Id.* at 1385.

Technicon did not inform the Court that liquid silicone, isoamyl alcohol, and mineral oil, the only possible choices of a liquid segmenting medium, all wet Teflon. The Court's reliance on Technicon's assertions that one skilled in the art would not choose a "wetting agent" as a segmenting medium clearly show that the court also construed the '593 patent as only covering claims for a nonwetted system.

I find that the claims, the specification, the preferred embodiment, the prosecution

history, and other relevant facts lead to the conclusion that the '593 claims can only be construed as covering a nonwetted system. The RFA-300 is a wetted system. It functions on entirely different principles. It does not literally infringe the patent.

### 5. *Continuation In Part Patents.*

Title 35 of U.S.C. § 120 provides:

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States or as provided by section 363 of this title, which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

■■■ A continuation in part application (CIP) is an application filed during the lifetime of an earlier application by the same applicant, repeating some substantial portion or all of the earlier application and adding matter not disclosed in the earlier case. *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1437 (Fed.Cir.1984). A CIP application has the legal effect of, and is basically a term of art for, a patent application disclosing the newly added matter. *Id.* If a CIP adds new matter not inherent in the original to an application, it is not properly entitled to the filing date of the initial patent. *Max Daetwyler Corp. v. Input Graphics*, 608 F.Supp. 1549, 1557 (E.D.Pa.1985).

On April 14, 1966 Technicon filed a CIP patent of the '593 patent seeking to patent the use of liquid silicone as a segmentizing medium with Teflon to gain smoothness and avoid bubble breakup and surging. The silicone has this effect because it smooths and wets Teflon. The CIP issued on December 16, 1969 as U.S. Patent No. 3,484,170 ('170).

On May 17, 1967 Technicon filed a CIP application of the '170 CIP patent. This CIP issued on November 18, 1969 as U.S. Patent No. 3,479,141 ('141 CIP) patent. The '141 CIP patent states that its object is to provide a sample transport system where no or minimal contamination between the samples occurs, even when using a process like a dialyzer. The patent discloses that in the '141 CIP invention, silicone wets and adheres to the conduit while the liquid samples do not wet and adhere.

### B. *Doctrine Of Equivalents.*

■■■ The doctrine of equivalents allows a patentee to proceed against the producer of a device if the device performs substantially the same function in substantially the same way to obtain the same result as the patented invention. *Graver Manufacturing Co. v. Linde Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The purpose of the doctrine is to "temper unsparing logic and prevent an infringer from stealing the benefit of an invention." *Id.* at 608, 70 S.Ct. at 856. "The doctrine can also be applied against the patentee." *Id.* Where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement. *Id.* at 609, 70 S.Ct. at 856. Equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. *Id.*

■■■ The doctrine of equivalents is a factual inquiry. *SRI*, 775 F.2d at 1124. Technicon has the burden of proving infringement by equivalents by a preponderance of the evidence. *Lemelson v. United States*, 752 F.2d 1538, 1547 (Fed.Cir.1985). Each element of a claim is material and essential and in order for a court to find infringement, plaintiff must show the presence of every element or its substantial equivalent in the accused device. *Id.* at

1551. Even a device which accomplishes substantially the same thing in substantially the same way as a patented object does not necessarily infringe. The court must determine whether the file wrapper history precludes a finding of infringement, regardless of any similarity between the devices.

The law of infringement requires that the asserted claims be compared with the products or processes accused of infringement. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1481 (3rd Cir.1984). Modification by mere addition of elements or functions cannot avoid infringement. *Id.* at 1482. Technicon asserts that Alpkem's mere addition of extra bubbles to the sample stream cannot avoid a finding of infringement. Alpkem's addition of air bubbles to the sample stream is the mode of operation of the prior art. It indicates that Alpkem's RFA–300 operates on an entirely different principle, the wetted principle, than Technicon's nonwetted system. I find there is a fundamental difference between the two devices, not a mere cosmetic one of simply adding more air bubbles to the stream.

The doctrine of equivalents is subservient to file wrapper estoppel. The patentee may not claim anything that would contradict limitations expressed before the Patent Office. *Hughes Aircraft*, 717 F.2d at 1363, quoting *Autogiro, supra* at 1566. The range of equivalents covered by the doctrine is much broader in the case of a pioneer invention than in the case of an improvement patent in a crowded field of art. *Hughes Aircraft*, 717 F.2d at 1362.

The file wrapper history in the present case shows the inventors surrendered claims relating to a wetted system that measures multiple segments of a sample. *See* Discussion at p. 1572. The record shows that Technicon tried to expand its initial claims to include a wetted system with multiple segments of a sample. However, when that attempt failed, it again amended its claims to only cover a nonwetted system where only one sample segment is measured. Technicon is estopped from

asserting that the '593 patent applies to a wetted system.

Taken as a whole, I find the RFA–300 is not the equivalent of the device described in the '593 patent. Many features of the RFA–300 differ from those disclosed in the '593 patent. The '593 discloses the use of nonwettable conduits and components as much as possible and the measurement of one segment of a sample, while the RFA–300 uses wettable conduits and components and numerous segments of a sample. The '593 patent does not teach the use of surfactants, of a wash cycle, of an air bar, or of bubble gating, while the RFA–300 employs all of these devices. The '593 patent discloses substantially instantaneous recording of the measurement with a square wave trace, while the RFA–300 employs extended measure of the segments which results in an S shaped curve.

The RFA–300 does perform substantially the same function as the '593, the measurement of samples by continuous flow analysis. However, the measurement is performed in a substantially different way. While they both do eventually measure the amount of various substances in the samples, they do in substantially different ways and achieve a dissimilar result. The RFA–300 is very different in principle from the '593 patent. Under the reverse doctrine of equivalents, I find the RFA–300 does not infringe the '593 patent.

### C. *Validity Of The Patent.*

Alpkem asserts that the '593 patent is invalid for three reasons:

(1) It was obtained by fraud or inequitable conduct because Technicon breached its duty of disclosure during the patent prosecution;

(2) The invention claimed and disclosed by the '593 patent is not operable (the utility requirement); and

(3) The '593 patent inadequately discloses the claimed invention (the enablement requirement).

Technicon asserts that the patent is valid and that these defenses are meritless.

A patent is presumed to be valid. 35 U.S.C. § 282; *see also Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1270 (Fed.Cir.1985). Alpkem must prove invalidity by clear and convincing evidence. *Atlas Powder v. DuPont*, 750 F.2d 1569, 1573 (Fed.Cir.1984).

### 1. Fraud Or Inequitable Conduct.

A patent applicant has a duty of disclosure pursuant to 37 C.F.R. § 1.56(a) which provides:

> A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application.... All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.

Breach of the duty of disclosure is a reason for declaring a patent unenforceable under 35 U.S.C. §§ 131 and 132. *See Buzzelli v. Minnesota Mining & Manufacturing Co.*, 521 F.2d 1162, 1166 (6th Cir. 1975).

A defendant must show materiality and intent. The court must then balance materiality and intent to determine whether inequitable conduct occurred. *See Atlas Powder*, 750 F.2d at 1578. Although Alpkem asserts Technicon engaged in fraud, inequitable conduct is a more appropriate phrase to describe the actions asserted here. *Id.* at 1577.

Materiality can be established by showing a "but for" causal relation, or a substantial likelihood that a reasonable examiner would have considered the omitted or false information important in deciding whether to allow the patent to issue. *Atlas Powder*, 750 F.2d at 1578. *See also* 37 C.F.R. § 1.56(a).

Intent need not be proven with direct evidence. *Atlas Powder*, 750 F.2d at 1578. It may be proven by showing acts the natural consequences of which are presumably intended by the actor. Gross negligence is sufficient for this proof. *Id.* Gross negligence occurs when the actor knew or should have known of the materiality of information. *Id.* Simple negligence, oversight, or an erroneous judgment made in good faith is not enough. *Id.* If inequitable conduct has occurred, the court must hold the patent claims unenforceable. *Id.*

Conduct which may make a patent unenforceable is broader than common law fraud. *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559 (Fed.Cir. 1984). If a court finds by clear and convincing evidence that inequitable conduct occurred, all the claims, not just the particular claims to which the inequitable conduct is directly connected, are unenforceable. *Id.*

Alpkem asserts that Technicon performed fraud on the Patent Office when it amended the patent application to attempt to cover both liquids and gases as segmenting mediums.

The patent specification discloses the use of only air or another gas as a segmenting medium. In a preliminary amendment of April 8, 1966, the applicants added the word fluid, which would encompass both liquids and gases, into its application to describe the segmenting medium.

In January 1968, the applicants introduced claim thirty-four (now claim one) and claims dependent on that claim. Claim thirty-four described the segmenting medium as an inert fluid. The examiner rejected claim thirty-four and dependent claims as not containing the necessary particularity. On April 15, 1970 the Board affirmed the examiner's rejection on three grounds:

(1) The specification failed to provide an antecedent basis for inert fluid;

(2) Additional structure was necessary to adapt the disclosed contribution to employ fluids other than air; and

(3) The term fluid was so broad it included inoperative fluids.

In its brief to the Board of Appeals, Technicon asserted that the prior art (the Kessler '367 patent) showed that liquid and gas are known segmenting medium. Technicon also asserted before the Board that it was unnecessary to describe obvious equivalents, that modification of the structure to use a liquid was within the range of one of ordinary skill that liquid and gas are directed equivalents.

I find that at the time it made the statements, Technicon knew, and did not disclose, that the Kessler art taught the use of liquid segmenting agents that are wetting to Teflon and would be inoperative in the nonwetted system.

In its brief before the CCPA, Technicon again argued that the Kessler prior art was aware that liquids and gases can be used as a segmenting medium and that their equivalency is evident. Technicon also argued that the specification teaches that one would not use a liquid which would adhere to the walls. But on May 25, 1964 there was no known liquid segmenting medium which would not wet Teflon. Based on Technicon's misrepresentations, the CCPA reversed the Board's rejection of the claims based on the use of the term inert fluid.

■■■ I find that a reasonable examiner would have considered these facts important in deciding whether to allow the patent application. These facts show the patent claims would be inoperable if a liquid were used as a segmenting medium. A reasonable examiner who received these facts even after the CCPA decision would have reopened prosecution and rejected the claims.

■■■■ Technicon asserts that knowledge of the CIP patents ('170 and '141) was not important and there was no reason to disclose them. Technicon also notes that the '170 CIP application was examined by the same examiner, Mr. Scrovonek, who examined the '593 patent. Therefore it argues that the examiner was aware of the '170 patent. However, in determining inequitable conduct, the mere possibility that an examiner has knowledge of a prior patent is not sufficient. *See J.P. Stevens*, 747 F.2d 1553, 1565 (Fed.Cir.1984). If

there is no evidence that the examiner actually recalled a previous patent, that knowledge cannot be implied. *Id.* In the present case there is no evidence that the examiner recalled the '170 patent application and Technicon cannot rely on this presumed knowledge to defeat an inequitable conduct claim.

Technicon now asserts that the term "wetting" only applies to a condition in which the liquid sample adheres to the walls of the conduit. It asserts that the patent does not state that the liquid segmenting medium must be nonwetting to the Teflon conduit and, therefore, asserts that the information contained in the CIP was not relevant to the pending '593 patent application. It asserts that Alpkem's assertions to the contrary comprise an argument that is "based on a house of cards."

However, as previously noted, in its brief to the CCPA to attempt to obtain the '593 patent, Technicon asserted:

This is certainly a positive teaching that one would not employ, as a segmentizing medium, any material which would adhere to the walls of the conduits or sight passageway of the flow cell. Such adherence would tend to cause contamination between successive liquid samples.

The CCPA, in discussing the Board's rejection of the application for the '593 patent, stated that the use of any liquid which would adhere to the walls as a segmenting medium would be predictably inoperative and would never be selected by one skilled in the art. *In re Smythe*, 480 F.2d at 1385.

The assertions made in the '141 CIP concerning the wetting properties of liquid silicone when used as a segmenting medium were direct contradiction to these assertions made by Technicon in its 1972 brief to the CCPA.

The facts not disclosed were clearly material. Technicon knew there were no liquids which could be used in a nonwetted system in the manner asserted in the '593 patent. After balancing the facts in this case, I find the evidence clear and convincing that Technicon engaged in inequitable

conduct before the Board and the CCPA. Because of this inequitable conduct, the patent is unenforceable.

### 2. *Enablement.*

For a patent to be valid it must comply with the requirements of 35 U.S.C. § 112 which provides, in part:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

 Section 112 disclosure requires a description that will allow someone familiar with the subject matter to reproduce and use the device or process without undue experimentation. *Atlas Powder,* 750 F.2d at 1569. The adequacy of the description and the level of knowledge required to make one "skilled in the art" are judged as of the date of filing of the patent application and are unaffected by later disclosures and advances in the art. *Application of John P. Glass,* 492 F.2d 1228, 1232 (CCPA 1974). The scope of the enablement provided to one of ordinary skill in the art by the disclosure must be commensurate with the scope of protection sought by the claims. *Id.*

 If some experimentation is necessary to make and use the claimed invention, that does not preclude enablement. *See Atlas Powder,* 750 F.2d at 1576. However, the amount of experimentation required must not be unduly extensive. *Id.*

 To comply with section 112 the description must be sufficient to allow someone with ordinary skill in the art to which it pertains or with which it is most clearly connected to practice the invention. The specification needs to describe the invention only in such detail as to enable a person skilled in the most relevant art to make and use it. *In re Naquin,* 398 F.2d 863, 866 (CCPA 1968). When an invention, in its different aspects, involves distinct arts, the specification is adequate when it enables those who have the best chance of being able to carry out the aspect related to their specialty. *Id.* If two distinct technologies are relevant to an invention, then the disclosure will be adequate if a person of ordinary skill in each of the two technologies could practice the invention from the disclosures. *In re Brown,* 477 F.2d 946, 950 (CCPA 1973). The person of ordinary skill in the field must be someone who is skilled in the design of the devices in question, not just in the use of the device. *Omark Industries, Inc. v. Colonial Tool Co.,* 672 F.2d 362, 362 (3rd Cir.1982) (user of wood splitting wedge not skilled in art).

The determination of who is skilled in the relevant art is a case-by-case factual determination. *In re Wilke,* 314 F.2d 558, 565 (CCPA 1963). I find that one skilled in the relevant art for purposes of the '593 patent is one who has formal training in a field such as chemistry or physics, has knowledge of the theories of how CFA works and how such machines function. For those few areas of the CFA where mechanical or electrical engineering knowledge is necessary, one skilled in the art should have enough knowledge to know when to consult with an expert in that area.

Technicon asserts that Alpkem's experts, Drs. Thiers, Habig, and Walker, are skilled in the use of CFA apparatus but are amateurs in the field of CFA manufacture and design. Dr. Thiers holds bachelors, masters, and doctorate degrees in inorganic and analytical chemistry. Dr. Walker holds an M.D. degree and has had training in both pathology and clinical chemistry. Dr. Habig holds a bachelors degree in chemistry and a doctorate in analytical chemistry. They have all written articles on both the theoretical aspects of CFA and on the construction of CFA devices. All of them were working in the field of CFA by the mid-sixties and worked with the clinical aspects of analyzing patent samples and attempted to develop new devices to improve CFA. In their work together in trying to develop new devices for CFA analysis, Drs. Habig and Thiers worked with a team that included an electronic specialist,

Lou Walters. The fact that Alpkem's experts retained clinical duties as well as conducting research into improving the CFA methodology and devices does not diminish their qualifications as persons of ordinary skill in both the use of and design of devices for CFA.

For its expert witness as to what one of ordinary skill in the art would be able to do or know at the time, Technicon offers Dr. Laessig who holds a bachelors degree in chemistry and a doctorate in analytical chemistry. Dr. Laessig has also built a CFA device, written articles about CFA, and directed a clinical chemistry lab.

■ Alpkem's experts have training and experience similar to Technicon's experts. All of the experts offered by both parties are very skilled in the art of developing CFA devices and can testify as to whether the '593 patent would be enabling to one of ordinary skill.

In 1978 Dr. Walker experimented with unwetted Teflon conduits and found the experience frustrating. He found that the theoretical advantage of nonwettability in reducing contamination could not be realized because of bubble breakup and violent surging in what should have been a steady flow of air and liquid segments. Dr. Walker stated that these problems were not generally known in the field at the time and that he gave up because he could find no way to stop the problem. Dr. Walker stated that a person of ordinary skill in 1964 would be unaware of an inert liquid segmenting medium nonwetting to Teflon. He stated that he is currently unaware of any liquid which is inert to and immiscible with aqueous samples and which is also nonwetting to Teflon for use in CFA and that no such liquid is generally known.

Dr. Habig and Dr. Thiers worked together with a team of researchers at Duke University to try and develop a CFA device containing the improvements contained in the '593 patent. They were not, however, aware of the patent at the time of their work. Dr. Habig joined Dr. Thiers's research in 1966. Both men stated that the device which they eventually built was the result of long, often frustrating, effort and that they then produced only an experimental device. Both Dr. Habig and Dr. Thiers stated that the disclosures in the '593 patent would not have shortened the effort and would, in fact, have misled the team. The Duke team encountered problems with finding a method of bubble-gating, finding a workable flow cell, changing the flow cell angle to avoid bubble hang up, and proportioning. Solving each of these problems took much time and experimentation on the part of the Duke team. Dr. Thiers also noted that the Duke team was unable to solve the problem of proportioning even with extensive experimentation until after he saw the inventors' patented air bar.

Between 1963 and 1965 Dr. Laessig constructed a CFA system which contained Teflon transmission lines but had eliminated the debubbler. His device also contained an electrochemical detector which developed a voltage signal that controlled the speed of a variable pump. He believes that the patent was enabling in 1964 and that one of ordinary skill in the CFA art could have designed and built the invention disclosed in the '593 patent without undue experimentation.

Some of the particular difficulties encountered by the inventors after the filing of the '593 patent application are discussed above. The problems with the bubble surging and breakup in Teflon conduits, proportioning of the sample and reagent, and the flow tube design will be discussed below as they relate to the enablement requirement.

■ Drs. Walker, Thiers, and Habig were unsuccessful in using nonwetted Teflon conduits. There is no liquid segmenting medium that does not wet Teflon. The '141 CIP teaches that liquid silicone wets Teflon conduits. Mineral oil and isoamyl alcohol also wet Teflon. In a nonwetted system there are problems with surging and bubble breakup because the air used as a segmenting medium causes a great deal of friction with the conduit walls. The invention of liquid silicone helped solve this problem in a wetted system, where this was not as much of a problem. However, it did not help this

problem in the nonwetted system disclosed by the '593 patent. Presently there is no liquid segmenting fluid available which will not wet Teflon. Therefore, the '593 patent, even when read with the '170 and '141 CIP patents, could not teach one of ordinary skill in the art to use a nonwetted system, with either air or a liquid as a segmenting medium and avoid the problem of bubble breakup and surging.

If the '593 patent had disclosed a wetted system, the proportioning of the sample and the accuracy of the intrasample air bubbles would be very important. Dr. Thiers stated that, after extensive experimentation, he was only able to solve this problem after he saw the inventors' air bar. The air bar was patented in 1967.

■■■■ To obtain a patent, 35 U.S.C. § 102 requires a showing that the invention was novel and nonobvious. While making this showing would not always negate enablement of a related patent, it is a probative element. In the present case, the air bar was essential to the operation of the '593 patent as a wetted system. The air bar patent shows that the air bar was nonobvious and the Duke team was able to invent an air bar only after seeing the patented air bar. These facts show that even if the '593 patent were to be interpreted to apply to a wetted system, one of ordinary skill in the art would have been unable to construct the device at that time.

Dr. Shamos noted that glass flow cells were a problem in a nonwetted system because of the difference in surface-free energy between the Teflon and the glass. After the '593 patent application was filed, Mr. Smythe and Dr. Shamos began using flow cells that were made of Teflon tubing, were straight and were shorter than the one used in the '593 patent. The optical path of the cell they eventually developed was much shorter than the '593 light path.

The flow cell in the '593 patent was meant to be the standard flow cell used on the AA. That flow cell would not work in a nonwetted system because of bubble hang up. The standard flow cell would not have worked in the wetted system because the volume would be too large for a sample

in a wetted system to fill the flow cell. Either the size of the cell or of the intra-sample segments used needed to be changed.

■■■ The '053 patent is some evidence that the design of the flow cell that would work in the invention disclosed in the '593 patent was not obvious. Dr. Thiers explained the numerous difficulties and extensive experimentation his team performed in trying to design a flow cell that would perform properly. The disclosure as to the flow cell design was not sufficient to allow one of ordinary skill in the art to design a workable flow cell.

All of the experts except Dr. Walker experimented for at least a period of two years before developing an experimental CFA device. Dr. Walker did not experiment for that period of time because he gave up before he actually built a device. The evidence is clear that the teachings of the '593 patent would not have assisted them. In fact, Drs. Habig and Thiers testified that the '593 patent teachings would have been misleading. I accept the testimony of Drs. Thiers, Habig, and Walker and find that the '593 patent does not meet the enabling requirement.

3. *Utility.*

■■■ Title 35 U.S.C. § 101 requires that any patentable invention be useful. The optimal operation of the invention is not required for a valid patent. *Atlas Powder*, 750 F.2d at 1577. If a properly claimed invention meets at least one stated objective, utility under section 101 is established. *See Rytheon Co. v. Roper Corp.*, 724 F.2d 951, 958 (Fed.Cir.1983). If a court finds infringement of otherwise valid claims then a finding of utility as a matter of law is mandated. *Id.* at 959. Proof of utility is further supported if the claims have on their merits been met with commercial success. *Id.* There is a close relationship between the section 101 requirement of utility and the section 112 requirement of enablement. Chisum on Patents, § 7.03(6) at p. 40.6. If a claim fails to meet the utility requirement because it is not

shown to be useful or operative, then it equally fails to meet the how-to aspect of the enabling requirement. *See In re Fouche,* 439 F.2d 1237 (CCPA 1971). However, the converse is not necessarily true, an invention may have great utility but the specification may fail to disclose adequately how to use it. *Mowry v. Whitney,* 81 U.S. 620 (14 Wall) 20 L.Ed. 860 (1871).

■ The utility of an invention must be determined as of the date of the invention. *Banning v. Southwestern Bell Tel. Co.,* 384 F.Supp. 831 (S.D. Texas, 1974). A process is operative if it produces its intended result. *In re Ruskin,* 354 F.2d 395 (CCPA 1966). To be patentable a device must be useful and to be useful it must work. *H. Brinton Co. v. Mishcon,* 93 F.2d 445 (1938).

■ At trial Alpkem conceded that its argument on operability was not strong. The evidence shows that, at the time of the filing of the application, the inventors had built an embodiment which was operable and whose concepts would have great utility and usefulness in the industry. Shamos and Smythe, from the information in their notebooks, clearly had an embodiment that performed. That embodiment may not have been functioning well enough to be commercially valuable at that time, but it was useful both to the research and to the commercial use of the product. The patent is useful and is not invalid on the grounds that it is either inoperative or not useful.

## CONCLUSION

The RFA–300 does not infringe Technicon's '593 patent either literally or under the doctrine of equivalents. The '593 patent is unenforceable because of inequitable conduct engaged in by Technicon before the Board of Patent Appeals. The '593 patent is invalid because it failed to disclose the invention sufficiently to enable a person of ordinary skill in the relevant art to build and operate the invention.